# OCTOBER SPECIAL TERM.

## CHARLESTON.

### STATE *v.* HARRISON.

Submitted Sept. 12, 1892.—Decided Oct. 1, 1892.

1. MURDER—SEPARATION OF JURY—NEW TRIAL—BURDEN OF PROOF —CRIMINAL PROCEEDINGS.

   A mere separation of a jury will not entitle the person to a new trial; but where there has been an improper separation of the jury during the trial, if the verdict is against the prisoner, he is entitled to the benefit of the presumption that such separation has been prejudicial to him, and the burden of proof is upon the State to show beyond a reasonable doubt that the prisoner has suffered no injury by reason of the separation. If the prosecution fails to do this, the verdict will be set aside.

2. MURDER—SEPARATION OF JURY—NEW TRIAL—BURDEN OF PROOF —CRIMINAL PROCEEDINGS.

   The same rule should be applied to all cases of misconduct or irregularity by the jury during the trial which are of such a character as to raise a presumption that the prisoner was prejudiced thereby.

3. MURDER—SEPARATION OF JURY—NEW TRIAL—BURDEN OF PROOF —CRIMINAL PTOCEEDINGS.

   The testimony of jurors may be received to disprove or explain any such separation, misconduct, or irregularity; but their testimony will not be received to show by what motive they were actuated, or that any admitted fact, misconduct, or irregularity had no influence or effect upon their minds in producing the verdict. In any case, where proper at all, the testimony of jurors should be received with great caution.

4. MURDER—SEPARATION OF JURY—NEW TRIAL—BURDEN OF PROOF —CRIMINAL PROCEEDINGS.

   Mere business conversation by a juror with another person, entirely foreign to the case on trial, in the presence and hearing of the sheriff and other jurors, will not avoid the verdict.

5. MURDER—NEW TRIAL—CRIMINAL PROCEEDINGS.

   A new trial will not be granted in a criminal case for matter that is a principal cause of challenge to a juror, which existed

92

before he was elected and sworn as a juror, but which was unknown to the prisoner until after the verdict, and which could not have been discovered by the exercise of ordinary diligence, unless it appear from the whole case that the prisoner suffered injustice from the fact that such juror served in the case. In determining this the court should look only to the evidence touching such cause of challenge; not to the evidence on the trial as to the prisoner's guilt.

6. MURDER—NEW TRIAL.

To set aside a verdict because of an opinion entertained by a juror before he was sworn, it ought to appear that such opinion was not merely unsubstantial and hypothetical, but such as would have excluded him from the jury had it been known before he was sworn.

7. MURDER—CONTINUANCE—REVERSAL.

A motion for continuance is addressed to the sound discretion of the court, under all the circumstances of the case; and, though an appellate court will supervise the action of an inferior court on such motion, it will not reverse the judgment on that ground, unless such action was plainly erroneous.

8. MURDER—CONTINUANCE—AFFIDAVIT.

Where a continuance is asked to procure the evidence of a witness not resident in the State, the affidavit should state not only the *bona fide* belief that such evidence can be procured, but the grounds of such belief, in order that the court may see that the belief is not merely a hope, but a well-founded, reasonable expectation, that it will be procured.

9. MURDER—INSANITY—LUNATIC—DE LUNATICO INQUIRENDO.

The court must see reasonable ground to doubt the sanity of a person about to be tried for felony before empanelling a jury to inquire as to his sanity. The court may inspect and examine the prisoner, consider his action and demeanor, read affidavits, inquire of physicians and others touching his then mental condition. The decision of the trial-court will have a very weighty, if not conclusive, influence in the appellate court, and will not be reversed, if at all, unless it very manifestly appears that the decision was wrong, or that the court abused the discretion lodged with it by the statute.

10. MURDER—INSANITY—LUNATIC.

A person partially insane is yet responsible for a criminal act if at the time of the act he knows right from wrong, and knows the nature and character of the particular act and its consequences, and knows that it is wrong, and is hurtful to another, and deserves punishment. In such case no mere irresistible impulse to do the act will exempt him from criminal responsibility for such act.

*Marcum, Peyton & Marcum* for plaintiff in error cited

Code, c. 159, ss. 1, 13; 3 W. Va. 699; 11 W. Va. 726; 81 Ala. 577; 1 Whar. Cr. Law. (9th Ed.) §§ 33, 43, 45; 1 Bish. Cr. Law (7th Ed.) § 386, *et seq.;* 1 Greenl. Ev. § 372; 1 Stev. Cr. Pom. Law § 168; 20 W. Va. 713, 750–759.

Attorney-General *Alfred Caldwell* for the State cited the following authorities:

1.— *The motion to quash the indictment was properly overruled.* —Code (1891) c. 144, s. 1; 24 W. Va. 767; Code (1891) c. 157, s. 3.

2.— *The continuance was properly refused.*—Code (1891) c. 159, s. 1; 27 W. Va. 511; Id. 32; 11 W. Va. 703; 7 W. Va. 447; 19 W. Va. 323; 1 W. Va. 145; 2 W. Va. 187.

3.—*Did the Court err in failing to empanel a jury to try the question of the insanity of the accused at the time of the trial?* —Code (1891) c. 159, s. 10.

4.—*James Kelley was a competent juror.*—33 W. Va. 319 and cases cited therein.

5.—*Should the motion to quash the panel of petit jurors have been sustained?*—Code (1891) c. 116, s. 14; 31 W. Va. 505.

6.— *The instructions for the State were unobjectionable.*—20 W. Va. 629; Id. 713; 28 W. Va. 297.

7.—*Defendant's instructions Nos.* 17, 21, *were improper.*—20 Gratt. 860.

8.— *The trial-court committed no error in refusing to set aside the verdict.*—20 W. Va. 713; 11 W. Va. 745; 9 W. Va. 456; 13 W. Va. 160; 22 W. Va. 802.

BRANNON, JUDGE:

On the 14th day of April, 1892, Allen Harrison was sentenced to death by the Circuit Court of Cabell county for the murder of Bettie Adams, and he comes to this Court for relief from that sentence.

Should the verdict be set aside because of separation of the jury? Between twelve and one o'clock at night a juror rose from his bed, and went to the water-closet of the hotel where the jury boarded, to answer a call of nature. The deputy sheriff in charge of the jury unlocked the door of the room wherein the juror slept and went with him into the hall leading to the closet and saw that no one was in

the hall and saw that the door of the closet was open and saw no one in the closet and says no one was in it, though there was a portion of the closet—the two apartments containing the bowls—which he could not see from where he stood; and the juror walked down the hall forty or fifty feet to the closet, the sheriff returning to bed but listening, and the juror remained absent from four to eight minutes and returned to the room. There was some rooms along the hall towards the closet, occupied perhaps by others, one by the high sheriff.

Without regard to the statements of the juror, it does not in any manner appear that this juror mingled with, saw, talked or had any sort of communication with any persons while absent. The facts, that it was at the dead hours of the night, that the hall was clear of persons, and that the apartment to which the juror went was not like the public rooms of an hotel, but a water-closet, render it highly improbable that the juror met or conversed with any one.

In all the Virginia and West Virginia cases, where verdicts have been set aside on account of separation of the jury, it appeared that the juror during the separation mingled and talked with other persons, or had ready opportunity to do so. I hardly think that where it safely appears that the juror has no communication nor opportunity for it with others, the mere separation, if we can call it "separation" in a legal sense, would vitiate a verdict.

But if we can read and credit the statement of the juror in question, then the fact, that he had no intercouse or opportunity for it with any other person, will not depend simply on the probability arising from the facts above stated; for he states that he neither spoke to nor saw any one while so absent. That we can consider the juror's statement is shown by the syllabus and opinion in State v. Cartright, 20 W. Va. 32, and instances in Virginia cases therein cited, (page 43) which are binding on us, in which affidavits of jurors were received.

We can not read that portion of the affidavit wherein the juror states that he did not go to the closet for any improper purpose connected with the trial, and that his absence had no influence upon his verdict, but we can read its state-

ment that he met with no one, saw no one, talked with no one. There is no showing in the slightest degree to the contrary ; and if we give this affidavit any weight, corroborated and rendered probably true by the other circumstances spoken of, we must be satisfied that its statements are true. Would it not be a stigma and reproach upon the administration of criminal law to reverse a solemn trial for such a cause, we being confident that the prisoner suffered no harm from the occurrence ? Separation merely does not necessarily annul a verdict ; it does so only *prima facie.*

Two Virginia cases are spoken of as holding that separation *per se* annuls the verdict—*McCaul's Case*, 1 Va. Cas. 271 ; *Overbee's Case*, 1 Rob. (Va.) 756. Perhaps I may add *Wormley's Case*, 8 Gratt. 712, though Judge RIVES, in *Philips's Case*, 19 Gratt. 541, says, perhaps correctly, that it is not to be interpreted as so holding. In none of these cases is there any reasoning by the court, except in *McCaul's Case*, and in it Judge NELSON, after saying that the one view of the subject was that the law required the jury to be kept entirely inaccessible, so that communication with them would be impossible, and the other view was that mere separation, unless it be proved that there has been some conversation or tampering with a member of the jury, shall not vitiate a verdict, and there must be proof to work this effect, disclaims a decision of the general principle, saying the court was not called on to decide between the two views, and would decide only whether the separation in that particular case should overthrow the verdict.

But later and well-considered cases hold that mere separation will not *per se* impair a verdict. *State* v. *Cartright,* 20 W. Va. 32 ; *State* v. *Robinson,* Id. 713; *Thompson's Case,* 8 Gratt. 637 ; *Philips's Case,* 19 Gratt. 485 ; *McCarter's Case,* 11 Leigh, 633. Even in the old Case of *Thomas,* 2 Va. Cas. 479, the doctrine that separation *per se* is fatal to the verdict is repelled, and, what is pointedly applicable to this case, it was held that "the bare possibility of tampering with the jury is not sufficient to set aside a verdict ;" and Judge DADE said : "But we think we have shown that in this case there was a bare possibility of such consequence, and we do not think ourselves justified, on account of remote possibil-

ity, to obstruct the justice of the country in a case where we can not doubt that the prisoner has received no injury."

So we may say in this case that the possibility of any communication of the juror with a soul is very remote, it being almost absolutely certain that he had not, and we are confident the defendant suffered no harm from the occurrence. The rule to be deduced from these cases is that a mere separation of the jury will not entitle the person to a new trial; but where there has been an improper separation he is entitled to the benefit of the presumption that it was prejudicial, and the burden is on the State to show beyond reasonable doubt that he suffered no injury. *State* v. *Robinson, supra; State* v. *Cartright, supra.*

This rule is an ample safe-guard over the purity of a jury trial. Any other rule would, as Judge THOMPSON said in *Thompson's Case, supra,* in these days, when criminal trials and adjournments in them are so numerous and protracted, result in frequent miscarriages in trials, and delay and defeat the ends of justice, when there is not the slightest presumption or probability, or even possibility, of injustice to the prisoner. It clearly appears that in this case he suffered no harm. While we must at all times guard the rights of the accused, we must not be so technical in procedure as to overturn fair trials for mere shadows, thus bringing criminal justice into endless delay and public derision.

Another occurrence relied upon to annul the verdict is this: The sheriff in charge of the jury had them in a public room of the hotel, and allowed a juror to converse with two persons, one a notary, touching the execution of a deed. The sheriff and a deputy were present, within eight to ten feet of the juror, when he met these persons and signed the deed. He saw the deed. The evidence of these two persons, the sheriff, and the juror shows clearly that nothing whatever touching the trial took place, and there was no conversation about anything save the mere signing and acknowledging the deed, which occupied three to five minutes, including the drafting of the certificate of acknowledgment. The other jurors were right at hand. There was no low conversation. Every one could see the deed spread out on the table and hear the conversation. This is no separa-

tion of the jury. The sheriffs were present, and other members of the jury also, and this juror was in charge of the officers.

While it is reprehensible in a sheriff in charge of a jury to allow conversation or transaction of business between jurors and other persons, yet this instance does not constitute misconduct in a juror in a legal sense, such as to impair the verdict. We might almost as well say that conversation at table between jurors and waiters, the sheriff being present, though ten or fifteen feet away, and not hearing such conversation, would impair the verdict.

In *Kennedy's Case*, 2 Va. Cas. 510, one of the jurors called to a friend from the window to send a message to his family, and to get his watch, though the sheriff did not hear the conversation, and it was held not cause for setting aside the verdict.

So in *Thomas's Case, supra,* a juror in presence of the sheriff but separate from the other jurors called to a neighbor and sent a message to his family, and it was held not sufficient to affect the verdict.

*Wormley's Case,* 8 Gratt. 712, cited to support this objection, does not do so, for there the sheriff left the room several times, remaining out from five to ten minutes each time, leaving three persons in the room with the jury, who conversed freely and drank spirits with the jury, but had no conversation as to the trial, while here the sheriffs were present in the room.

Should the verdict be set aside because Ward, one of the jurors, said before he was put on the jury that if the jury should return a verdict that Harrison was insane the jury ought to be hung, and that Harrison ought to be hung? In the first place, we do not know but that the opinion of the juror so expressed was a merely hypothetical, unsubstantial opinion based on mere rumor, and not such as to have disqualified him had it been known when he was questioned on his *coir dire;* for the mere fact that a juror has expressed an opinion does not necessarily disqualify him. *State* v. *Schnelle,* 24 W. Va. 767, and *State* v. *Baker,* 33 W. Va. 319 (10 S. E. Rep. 639.)

The Virginia general court very long ago held that de-

clarations by jurors that the prisoner was doomed to the penitentiary, and that he ought to be hung, would not call for a new trial ; the court saying that it did not appear the juror had a deliberate opinion. *Smith's* and *Kennedy's Cases*, 2 Va. Cas. 6, 510.

Likely the juror in this case was giving vent to mere idle declarations, not real opinion. But, in the second place, it is settled by many cases that a new trial will not be granted for matter that is principal cause of challenge, which existed before the juror was sworn, but which was unknown to the prisoner until after the verdict, unless it appears from the whole case that the prisoner suffered injustice from the fact that the juror served in the case. *Greer's Case* 22 W. Va. 802; *State* v. *Strauder*, 11 W. Va. 745 ; *State* v. *McDonald*, 9 W. Va. 456, and Virginia cases there cited.

In *Greer's Case* the juror said the prisoner ought to be hung, but it was no cause for a new trial. And, in the third place, the juror denies that he made any such statement. There is nothing to show that the prisoner suffered injustice from the presence of Ward on the jury, and the Circuit Court judge was of opinion that he had not; and, under the many cases holding the doctrine above stated, we must hold this no cause for setting aside the verdict.

Did the court err in refusing to continue this case ? An affidavit made by the prisoner's father stated that Dr. Erwin had been a long time the attending physician of the prisoner, and that Erwin had told affiant that the prisoner's mind was disordered and unbalanced ; that he told him what function of the brain was disordered, and the cause of the disorder ; and that Erwin lived in Tennessee, and affiant regarded his testimony as material, and did not know of any witness by whom the same facts could be shown ; that Erwin removed from Cabell county five years before that time, and affiant did not know of his whereabouts, but that his whereabouts could be ascertained. The affidavit, while stating that affiant did not know of any witness by whom the same fact stated by Erwin could be proven, does not state that affiant had made inquiry to learn whether he could do so or not. He certainly knew what physicians

had attended his son. The range of inquiry was confined to a few physicians in the neighborhood. Erwin had been absent five years, and no place in Tennessee is named as his residence, and his whereabouts are unknown. Was there any certainty of ever getting his deposition?

In *Wilhelm* v. *State*, 72 Ill. 468, and *Dacey* v. *People*, 116 Ill. 556 (6 N. E. Rep. 165) it was held that, where a continuance is asked because of the absence of a nonresident witness, the affidavit must state, not only the party's belief that his attendance can be procured, but also the grounds of such belief, so that the court may see whether there is a reasonable ground for the expectation that his evidence can be procured; and without such statement the affidavit is defective. It is different from a resident witness. It was also held that a continuance will not be granted where the evidence is only cumulative, unless it be shown there will be conflict of evidence.

Furthermore, a physician who treated the prisoner for masturbation, and stated that in his opinion the prisoner was affected with a form of insanity called *"melancholia,"* was introduced as a witness for the defence, and the father and many others gave evidence for the prisoner upon the only defence made by the prisoner—that of insanity—and there was on both sides a large volume of evidence upon that question; and all this enables us to say that the question of the prisoner's sanity was fully, fairly, and elaborately presented to the jury, and that the evidence of the witness Erwin, if attainable, would have been only additional or cumulative; and we can not see with any certainty that its absence was detrimental, or could have been detrimental, to the prisoner's cause; and therefore we have under this head only to apply the rule of law, well settled in this Court, that a motion for continuance is addressed to the sound discretion of the Court, under all the circumstances of the case; and though an appellate court will supervise the action of an inferior court, and reverse it where it has ruled a party into trial when he was entitled to a continuance, yet it will not reverse on that ground, unless such action was plainly erroneous. The judge presiding sees all the surroundings of the trial, and can better than we decide

whether the design of the motion for a continuance is delay, or whether a continuance is really essential to a fair and proper trial. It is not without force to add that the statute (Code c. 159, § 1) commands a trial at the same term at which the indictment is found, unless good cause be shown for continuance. *Fiott* v. *Com.*, 12 Gratt. 576; *Hewitt's Case*, 17 Gratt. 627; *Betsall's Case*, 11 W. Va. 703; *Davis* v. *Walker*, 7 W. Va. 447; *Buster* v. *Holland*, 27 W. Va. 511.

Did the court err in failing to impanel a jury, before trial of the prisoner's guilt, to inquire as to his sanity when called to trial? Code, c. 159, ss. 9, 10, provide that no one while insane shall be tried for crime, and that, if the court see reasonable ground to doubt his sanity, the trial shall be suspended until a jury inquire of his sanity. That feature of the statute which forbids a trial while the party is insane is only declaratory of the common-law, as was held of a similar statute in *Freeman* v. *People*, 4 Denio, 9; for Blackstone says: "If a man in his sound memory commit a capital offence, and before arraignment for it becomes mad, he ought not to be arraigned for it, because he is not able to plead to it with that advice and caution that he ought." 4 Bl. Comm. 24; 1 Hale, P. C, 34; 2 Bish. Crim. Proc. § 666; 1 Chit. Crim. Law, 761.

While at common-law, in capital cases it was the more usual course, when it appeared that the sanity of the accused was doubtful, to inquire touching it by a jury, yet inspection of the accused by the judge without a jury was allowable. 2 Bish. Crim. Proc. § 666; 1 Hawk, P. C. 3, note; 1 Hale, P. C. 33, *Freeman* v. *People, supra*; *Bonds* v. *State*, Mart. & Y. 142. But our statute has in the latter respect changed the common-law by requiring, when the court sees reasonable ground to doubt the sanity of the accused, that the question of his sanity shall be tested by a jury.

Next comes the question whether, upon a mere suggestion of present insanity, or even when it is supported by affidavit, the judge is compelled to order a jury, even when he is satisfied that the accused is feigning insanity to avoid trial, or is competent to make a proper defence.

At common-law, I think, the jury inquest was simply to inform the conscience of the court. The case of *Webber* v. *Com.*, 119 Pa. St. 223 (13 Atl. Rep. 427) was upon a statute providing that, "if any person, upon arraignment, be found a lunatic by a jury lawfully impanelled for the purpose," he should be kept until capable of trial, thus granting him a jury upon the question of his sanity; and it was held that such inquiry by a jury could only be had when the judge has doubts respecting the sanity; that such inquest may be had, at the discretion of the judge, for the purpose of informing his conscience whether the trial ought to proceed, but that the defendant is not, as a matter of legal right, entitled to such jury; and that the question of sanity, both at the date of the offence and trial, was before the jury on the trial of the main issue, and, after a conviction finding that he was and is sane, the appellate court would not inquire whether the discretion of the inferior court was properly exercised in refusing a jury for a preliminary inquiry as to sanity.

The court said that neither the suggestion of the prisoner nor his counsel nor affidavits could alone suffice to create the doubt necessary to ordering a jury; that they are necessarily addressed to the court, as there is no other tribunal to entertain them, and it is the court which must be affected by considerations supposed to produce the doubt which must precede the inquiry; that a personal inspection of the prisoner, public or private, inquiry from physicians and those around the accused, might be resorted to—all these and others may contribute to create doubt in the mind of the judge, and for that reason all might be resorted to; and if, after all had transpired, the judge has no doubt of the prisoner's sanity, he is neither bound, nor ought he, to order a jury. It is his judicial conscience alone that is to be satisfied. So it was held to be a matter of sound discretion with the judge in *Jones* v. *State*, 13 Ala. 157, and *State* v. *Arnold*, 12 Ia. 483, and that the inquiry should not be allowed if, from all the circumstances, the court had no ground to doubt the prisoner's sanity. *Guagando* v. *State*, 41 Tex. 626, is to the contrary.

From the letter of our statute, and the reason and public

policy pertinent to the subject, the decision of the judge must have a very weighty, if not decisive, influence; though, in case of abuse of discretion, I should think it remediable. The judge saw the prisoner face to face, and scanned his countenance, his demeanor and actions, and saw all the surroundings of the trial, as we can not see them, and was far more competent to say whether the prisoner was in a state of mind fit to undergo a trial, or was simply seeking delay, than are we. Who was better able to pass on the question? There was no showing of his insanity beyond the affidavit of his father that he was not mentally in a condition to undergo trial, and it did not allege his insanity, though I make no point as to this. We can not on appeal overrule the circuit judge on this matter. We do not see that he abused the discretion lodged with him by the statute. We see only the affidavit of the prisoner's father against the judge's action, and see nothing of the important evidence present to the judge, and moving him to his action.

Is there error in giving, at the State's instance, the following instruction: "The court instructs the jury that if they believe from the evidence beyond a reasonable doubt that the prisoner, at the time of firing the shot or shots which caused the death of Bettie Adams, was capable of knowing the nature and consequence of his act, and, if he did not know, then that he knew he was doing wrong, and that so knowing he fired the shot or shots at the deceased with the willful, deliberate, and premeditated purpose of killing her, they will find the prisoner guilty of murder in the first decree."

The criticism upon it is that it makes the test of criminal accountability turn on the capacity to know right from wrong and a knowledge that the accused knew the particular act was wrong—a principle propounded by early decisions; whereas, the modern law does not make this the only test but couples with the "right and wrong" test the power of choosing between the two and the power of the will over the actions; that, though the accused had capacity to know right from wrong, and knew the particular act was wrong, and knew the nature and consequences of that

act, yet if by reason of mental disease he had not the power to choose between the right and wrong, and had not power to resist doing the act, he should not be held responsible.

Even if this theory be granted, the above instruction is not bad; for, in addition to its requiring for conviction that the accused must have been able to know the nature and consequence of the act, and that he was doing wrong in committing it, the instruction also requires that the act was willful, deliberate, and premeditated. If willful, his will must have entered into his act; if deliberate and premeditated, it was the result of reason and reflection, of will and thought concurring, not of irresistible impulse. To do a willful, deliberate and premeditated act one must have reasoning powers, and the power to exercise the will to refrain from the act or to commit it; not a mere momentary impulse.

Defendant's instruction 7 told the jury that "a premeditated design or purpose is one resulting from thought and reflection. A design conceived and afterwards so deliberately considered, as to become resolved and fixed in the mind, is regarded by law as premeditated." So in requiring the act to be willful, deliberate and premeditated, it logically required will-power, and capacity to exercise it and to avoid the act. But its theory is wrong for reasons below given.

Is there error in refusing instruction 17? The instruction is as follows: "That, in order to constitute a crime, a man must have intelligence and capacity enough to have a criminal intent and purpose, and if his reason and mental powers are either so deficient that he has no will, no conscience, or controlling mental power, or if, through the overwhelming violence of mental disease, his intellectual power is for the time obliterated, he is not a responsible moral agent, and is not punishable for criminal acts."

If we concede it to be correct, then we say that, as the court in defendant's instruction fifteen told the jury definitely that insanity was a full legal defence, and gave instructions sixteen and eighteen, they gave the prisoner the benefit of the principle of the instruction as effectually as if that instruction had been given, and the prisoner suffered no

harm from its refusal. The instruction is obscure in meaning.

Is there error in refusing instruction twenty one? That instruction is in the following words: "The court instructs the jury that a man may have reason and intelligence sufficient to enable him to distinguish and know the difference between right and wrong. He may know that the act he is about to commit is wrong; and yet, if from defect, weakness, or disease of the mind, he is incapable of controlling his acts, and of resisting the impulse to commit the act, then the act, however great a crime it may be, is not a willful act, and therefore not criminal. Therefore, if the jury believe that, although the prisoner, Allen Harrison, at the time of the commission of the alleged crime, knew it was wrong, yet if the jury believe and are satisfied from the evidence in this case that his will power was so impaired by disease or otherwise as to render him incapable of controlling his acts or resisting the impulse so to do, then the killing of Bettie Adams under such circumstances was not the willful act of the prisoner, and he should not be held criminally responsible therefor."

This instruction requires us to say whether it proposes a proper legal test of criminal responsibility. It is based upon the theory above mentioned, that, though a person have capacity to know right from wrong, and to know that the particular act is wrong, yet if he has not will-power to avoid the act, if he is instigated to it by uncontrollable impulse, he is not criminally liable; and that the "right and wrong" test is not the proper test, as it excludes the effect of uncontrollable impulse. It is conceded that this instruction is not good under the criminal law as stated in the earlier text-books and decisions, but it is claimed that it is sustained by the later and better decisions and text-writers.

Lords Coke and Hale wrote that to exonerate from crime on account of insanity a man must be totally deprived of memory and understanding; and Justice TRACY, on Arnold's trial in 1724 (16 St. Trials, 695) said he must be one totally deprived of memory and understanding, and doth not know what he is doing, no more than an infant, a brute, or wild beast.

These statements are not recognized in their fullness in later years, yet in modern cases the courts have generally stated the question of responsibility to be whether, at the time the prisoner committed the act, he had mental capacity to know right from wrong, and comprehend his relations to others, and to understand the nature and consequence of the particular act, and that the act was morally wrong, or, what is the same, whether he was conscious of doing wrong. 1 Bish. Crim. Law, § 475.

This is the "right and wrong" test, as commonly called. It has had for a long time, and has today, the sanction of the most eminent legal authority, those best acquainted with the real and practical demands of the daily administration of justice, as best suited to it, all things considered, and as at once the safest rule for the protection of human life and the preservation of those charged with crime. In 1843, in answer to questions propounded by the house of lords as to crimes committed by persons afflicted with insane delusions in respect to one or more particular persons or subjects, and what were proper questions to be submitted to a jury in such case, and in what terms the question should be left to the jury as to the prisoner's state of mind at the time of the act, the judges of England laid down these principles:

"A person laboring under partial delusions only is nevertheless punishable if he knew at the time of committing such crime he was acting contrary to law;" and "that the jury ought to be told in all cases that every man is presumed to be sane, and to possess sufficient reason to be responsible for his crimes, until the contrary be proved to their satisfaction; that to establish the defence of insanity it must be clearly proved that at the time of committing the act the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong. The mode of putting the latter part of the question to the jury on these occasions has generally been whether the accused, at the time of doing the act, knew the difference between right and wrong, which mode, though rarely, if ever, lead-

ing to any mistake with the jury, is not, as we conceive, so accurate, when put generally and in the abstract, as when put with reference to the party's knowledge of right and wrong in respect to the very act with which he is charged." 1 Russ. Crimes, 19 ; 2 Greenl. Ev. § 373, and note.

These answers of the judges are based on the "right and wrong" test, and, though sometimes criticised, they · have prevailed in England since 1843. They do not recognize the doctrine of irresistible impulse as an independent element of test. In New York, in 1847, in *Freeman* v. *People*, 4 Denio, 9, these answers of the English judges were recited as the law as it should be given to the jury, and it was said that in murder trials, where insanity is the defence, "the inquiry is always to be brought down to the single question of a capacity to discriminate between right and wrong at the time when the act was committed."

In *Flanagan* v. *People*, 52 N. Y. 467, the law was again affirmed as set forth by the English judges, and the doctrine of uncontrollable impulse, as co-existent with a perception of the moral quality of the acts done, was rejected as a "new element;" the court saying : "We are asked to introduce a new element into the rule of criminal responsibility in cases of alleged insanity, and to hold that the power of choosing right from wrong is as essential to legal responsibility as the capacity of distinguishing it, and that the absence of the former is consistent with the presence of the latter. The argument is on the theory that there is a form of insanty in which the faculties are so disordered and deranged that a man, though he perceives the moral quality of his acts, is unable to control them, and is urged by some mysterious pressure to the commission of the act, the consequences of which he anticipates, but can not avoid. Whatever medical or scientific authority there may be for this view, it has not been accepted by courts of law. The vagueness and uncertainty of the inquiry which would be opened, and the manifest danger of introducing the limitation claimed into the rule of responsibility, in cases of crime, may well cause courts to pause before assenting to it. Indulgence in evil passions weakens the restraining power

of the will and conscience, and the rule suggested would be the cover for the commission of crime and its justification. The doctrine that a criminal act may be excused upon the notion of an irresistible impulse to commit it, where the offender has the ability to discover his legal and moral duty in respect to it, has no place in the law. ROLFE, B., in *Rogers* v. *Allunt,* where, on a trial for poisoning, the defendant was alleged to have acted under some moral influence which he could not resist, said : "Every crime was committed under an influence of such a description ; and the object of the law was to compel people to control this influence."

The New York court laid down the law to be that "the test of reponsibility is the capacity of defendant to distinguish between right and wrong at the time of and in respect to the act complained of," and that "the law does not recognize a form of insanity in which the capacity of distinguishing right from wrong exists without the power of choosing between them."

Later, in *People* v. *Carpenter,* 102 N. Y. 238 (6 N. E. Rep. 584) this doctrine is again held. In 1889 the South Carolina Supreme Court held that "mere irresistible impulse to commit murder by reason of mental derangement at the time of the act is not a defence, as long as the accused knew that the act he was committing was a crime morally and punishable by law." *State* v. *Alexander,* 30 S. C. 74 (8 S. E. Rep. 440.)

In the debate of the House of Lords upon the answer of the fourteen judges of England to the questions propounded by the House of Lords, Lord BROUGHAM said that if the perpetrator knew what he was doing ; if he had taken the precaution to accomplish his purpose ; if he knew at the time of doing the desperate act, that it was forbidden by law—that was his test of sanity, and he cared not what judge had given another test, he should go to his grave believing it was the real, sound and consistent test. I fully concur with Lord BROUGHAM.

In *Reg* v. *Barton,* 3 Cox, Crim. Cas. 278, that great jurist Baron PARKE, said the single question was whether, at the time of the act, the prisoner knew the nature and character

of the deed, and, if so, whether he knew he was doing wrong; and further said that he concurred with the view previously taken by Baron ROLFE that the excuse of an irresistible impulse, co-existing with the full possession of the reasoning powers, if allowed as a defence, might be urged in justification of every crime; for every man might be said not to commit crime except under the influence of some irresistible impulse; that something more than this was necessary to justify acquittal on the ground of insanity; and it would be for the jury to say whether the impulse, under which the prisoner had committed the deed, was one which altogether deprived him of knowledge that he was doing wrong.

In *U. S. v. Holmes,* 1 Clif. 98, Mr. Justice CLIFFORD pointedly rejected the "irresistible impulse" test, after a review of the cases. He said that it had been suggested that the rule in the State courts was different from the English rule, but that his examination had led him to the conclusion that the great majority of the well-considered cases followed the English judges; and on another page he says all the well-considered cases in both countries since 1843 followed their answers. He said that, in case of partial insanity, it is a question for the jury to determine, under all the evidence, whether the degree of insanity is sufficient to constitute a valid defence; "and if it appears that the mind of the accused is merely clouded and weakened, but is not incapable of reasoning and judging between right and wrong in respect to his own particular act, that he still understands the nature and character of the act and its consequences, and has a knowledge that it is wrong and criminal, and mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and deserve punishment, then the law on that state of facts properly regards the accused as a moral agent, responsible for his criminal acts, and punishable for the crime; and to admit, in such a case, that the defence may be set up successfully that he was impelled to the commission of the act by any uncontrollable or irresistible impulse, would be to overlook and disregard the test or criterion of responsibility for criminal acts which the law itself establishes in such a

case, and to allow that defence in justification of every crime
known to the law."

Courts have to ask themselves what is meant by that in-
sanity which excuses from crime because of incapacity to
entertain criminal intent. The infinite and intricate phases
of disorders of the mind are interesting, and their study
necessary in that noble science which gives relief in the
most distressing and saddest of human ailments, and which
in our days, unlike the days of Shakespeare, can "minister
to a mind diseased, pluck from the memory a rooted sor-
row, raze out the written troubles of the brain." But the
law is not a metaphysical or theoretical science; it must
follow principles suitable to the practicle wants of men in
organized society by protecting it against heinous crime.

Mr. Justice CURTIS, in *U. S.* v. *McGlue*, 1 Curt. 9, adopt-
ed the "right and wrong" test as the test which the law ap-
plied, and said these were the questions for the jury: "Did
the prisoner understand the nature of the act when he stab-
bed Mr. Johnson? Did he know he was doing wrong, and
would deserve punishment? Or, to apply them more near-
ly to this case, did the prisoner know that he was killing
Mr. Johnson; that to do so was criminal and deserving
punishment? If so, he had the criminal intent necessary
to convict him of murder, and can not be acquitted on the
ground of insanity."

The "irresistible impulse" test has been pointedly rejected
also in Missouri in *State* v. *Pagels*, 92 Mo. 300 (4 S. W. Rep.
931) the court saying: "It will be a bad day for this State
when uncontrollable impulse shall dictate a rule of action
to our courts." It has been specifically rejected twice in
Kansas—*State* v. *Nixon*, 32 Kan. 205 (4 Pac. Rep. 159);
*State* v. *Mowry*, 37 Kan. 369 (15 Pac. Rep. 282) and in North
Carolina in *State* v. *Brandon*, 8 Jones (N. C.) 463. See 4
Amer. & Eng. Enc. Law, 718.

Mr. Bishop does not regard this test as adopted, for in 1
Crim. Law, § 475, he says the "right and wrong" test is the
one generally applied by the courts; and in section 478 he
says that it is understood in science, and sometimes recog-
nized in courts, though judges are slow to yield on the
point, that the mental and physical machine may slip the

control of the owner, and so a man may be conscious of what he is doing, and its criminal character and consequences, while yet he is impelled onward by a power irresistible. But he says this is not the rule of the courts.

In Illinois, in two cases, it is held as to the defence of irresistible impulse, that it must proceed from an unsound mind affected with insanity "to such a degree as to create an uncontrollable impulse to do the act by overriding his reason and judgment." *Hopps* v. *People*, 31 Ill. 391; *Dacey* v. *People*, 116 Ill. 555 (6 N. E. Rep. 165.) In other words, the party, because of insanity, knew not the wrong of the act.

The California Supreme Court, in *People* v. *Hoin*, 62 Cal. 120, held that an irresistible impulse to commit a criminal act "does not absolve the actor, if at the time and in respect to the act he had the power to distinguish between right and wrong."

In Maine, an instruction based substantially upon it was held to have been properly rejected. *State* v. *Lawrence*, 57 Me. 577, 581.

The cases are almost without number which, while not passing on the "irresistible impulse" test expressly, yet logically exclude it, because they lay down the "right and wrong" test above stated. See note to *State* v. *Marler*, 36 Amer. Dec. 407; note to *Guiteau's Case*, 10 Fed. Rep. 195. The "right and wrong" test was approved in the *Guiteau Case*. In a few States the "irresistible impulse" test is upheld. See notes just cited.

The case of *Parsons* v. *State*, 81 Ala. 577 (2 South Rep. 854) is cited to us as one of the best-considered cases supporting this rule, holding that, though there be a capacity to distinguish between right and wrong, as applied to the particular act, still the party is not responsible if by reason of duress of mental disease he has so far lost the power to choose between right and wrong as not to avoid doing the act, so that his free agency was at the time destroyed, and at the same time the crime was so connected with such mental disease, in relation of cause and effect, as to have been the product or offspring of it solely. A dissenting opinion of great ability was filed to that decision, and it overruled

a decision to the reverse in Alabama in *Boswell's Case*, 63 Ala. 307. So, also, *Smith* v. *Com.*, 1 Duv., 224. So, also, held the Indiana court in *Stevens* v. *State*, 31 Ind. 485. The opinion in the last case plants this decision on the opinion of Chief Justice SHAW in *Com.* v. *Rogers*, 7 Metc. (Mass.) 500.

It struck me that the opinion of Chief Justice SHAW not only did not support this view, but supported the "right and wrong" test; and I find that Mr. Justice CLIFFORD concurs in this view by citing Chief Justice SHAW's opinion in support of the "right and wrong" test in *U. S.* v. *Holmes, supra.*

Chief Justice SHAW said, as to the cases of partial insanity, the rule of law "is this : A man is not to be excused from responsibility if he has capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he is then doing; a knowledge and consciousness that the act is wrong and criminal, and will subject him to punishment. In order to be responsible, he must have sufficient power of memory to recollect the relation in which he stands to others, and in which others stand to him, and that the act he is doing is contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty. On the contrary, although he may be laboring under partial insanity, if he still understands the nature and character of his act and its consequences, if he has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong, and receive punishment—such partial insanity is not sufficient to exempt him from responsibility for criminal acts.

The words, "mental power sufficient to apply that knowledge to his own case," mean only capacity to apply his knowledge of right and wrong to the particular act so as to know whether it is wrong. The judge did not mention will power. I can not see how the eminent Chief Justice SHAW can be quoted on this statement of the rule, as favoring the "irresistible impulse" test.

The eminent Chief Justice DILLON is quoted as approving this test in *State* v. *Felter*, 25 Iowa, 67; whereas his

opinion can not be so regarded. He did say the "right and wrong" test should not be applied too strictly in all cases. He admitted that the cases of authority recognized that a party was responsible if he knew the act was wrong, but said that if it should, by the observation and concurrent testimony of medical men, come to be definitely established as true that there is a diseased condition of mind in which, though the person knows abstractly that his act is wrong, yet from insane impulse, proceeding from an insane mind, he is driven to the act irresistibly, then the law must be modified. This is purely hypothetical or conditional; an admission that such then was not the law. And in the actual decision he held as proper, and not erroneous, an instruction based on the "right and wrong" test, and said :

"With reference to the 'right and wrong' test referred to in the instructions, it will be seen that the court does not adopt this criterion as a general one; that is, it does not say that, if the defendant has capacity to distinguish between right and wrong generally, he is criminally responsible. But it held that if at the time and with respect to the act about to be committed the defendant had not reason enough to discriminate between right and wrong with reference to that act, and had not reason enough to know the nature of the crime, and did not know that he was doing wrong in committing it, he is not criminally punishable. The court, in substance, held that if the defendant's reason was so far gone or overwhelmed that his perception of right or wrong with respect to the contemplated act was destroyed; if he did not rationally comprehend the character of the act he was about to commit—he should be acquitted. The instruction as given finds full support in the judgments of courts the most respectable. *Freeman* v. *People*, 4 Denio, 27, approved in *Willis* v. *People*, 32 N. Y. 715 ; *State* v. *Brandon*, 8 Jones (N. C.) 463 ; *Com.* v. *Mosler*, 4 Pa. St. 264 ; *McNaghten's Case*, 10 Clark & F. 210 ; *Oxford's Case*, 9 Car. & P. 525."

He thus quotes the very cases holding the "right and wrong" test. How this case of *State* v. *Felter* can be cited to sustain the "irresistible impulse" test, I am unable to see. And in the later case of *State* v. *Mewherter*, 46 Iowa, 88, the

court held that to justify acquittal for uncontrollable propensity the insanity "must be such as to destroy the power to comprehend rationally the nature and consequences of his act, and overpower his will."

Several cases cited in note in 36 Amer. Dec. 407, as on the side of the "irresistible impulse" test are not on its side, but against it, some of them. *Ortwein* v. *Com.* 76 Pa. St. 414; *Com.* v. *Mosler*, 4 Pa. St. 264; *Brown* v. *Com.*, 78 Pa. St. 122; *Sayres* v. *Com.*, 88 Pa. St. 291; *State* v. *Gut*, 13 Minn. 358 (Gil. 315); *State* v. *Shippy*, 10 Minn. 229 (Gil. 178); *Blackburn* v. *State*, 23 Ohio, 146, and others. The "irresistible impulse" test seems to meet the approval of the distinguished law-writer, Mr. Wharton, Whart. Hom. § 574; 1 Whart. Crim. Law, § 44; 1 Whart. & S. Med. Jur. § 147.

This "irresistible impulse" test has been only recently presented, and, while it is supported by plausible arguments, yet it is rather refined, and introduces what seems to me a useless element of distinction for a test, and is misleading to juries, and fraught with great danger to human life, so much so that even its advocates have warningly said it should be very cautiously applied, and only in the clearest cases. What is this "irresistible impulse?" How shall we of the courts and juries know it? Does it exist when manifested in one single instance, as in the present case, or must it be shown to have been habitual, or at least to have evinced itself in more than a single instance, as Chief Justice GIBSON said must be the case? We have kleptomania and pyromania, which better works on medical jurisprudence tell us can not excuse crime where there is capacity to know the character of the act. Whart. & St. Med. Jur. §§ 592, 602, 616. Shall we introduce homicidal mania, and allow him of the manslaying propensity to walk innocent through the land while yet not insane, but capable of knowing the nature and wrong of his murderous act?

For myself I can not see how a person who rationally comprehends the nature and quality of an act, and knows that it is wrong and criminal, can act through irresistible innocent impulse. Knowing the nature of the act well enough to make him otherwise liable for it under the law,

can we say that he acts from irresistible impulse, and not criminal design and guilt? And if we are sure he was seized and possessed and driven forward to the act wholly and absolutely by irresistible impulse, his mind being diseased, how can we say he rationally realized the nature of the act—realized it to an extent to enable us to hold him criminal in the act? How can the knowledge of the nature and wrongfulness of the act exist along with such impulse as shall exonerate him? Can the two co-exist? The one existing, does not the other non-exist?

Can we certainly say that a person who is really driven to an act by such an impulse is capable, at the instant of the act, of knowing its true nature? The mother who threw her child overboard into the billows of the deep was held innocent because she was possessed and impelled by the uncontrollable impulse to do so, while yet she was conscious of the heinousness of the act. Can we be sure she knew the character of the act? If in fact she did, can we safely say she was driven on by the mysterious spirit of irresistible impulse? So it appeared to the Kansas court in *State* v. *Nixon,* 32 Kan. 205 (4 Pac. Rep. 159) where the court says:

"It is possible that an insane impulse is sometimes sufficient to destroy criminal responsibility, but this is probably so only when it destroys the power of the accused to comprehend rationally the nature, character, and consequences of the particular acts, and not where he still has the power of knowing the character of the acts, and that they are wrong. * * * The law will hardly recognize the theory that an uncontrollable impulse may so take possession of a man's faculties and powers as to compel him to do what he knows to be wrong and a crime, and thereby remove him from all criminal responsibility. Whenever a man understands the nature and character of an act, and knows that it is wrong, it would seem that he ought to be held legally responsible for the commission of it."

After preparing this opinion, I met with Stephens's History of the Criminal Law of England. Mr. Stephens is quoted as favoring the "irresistible impulse" theory, and in volume 2, pp. 170, 171, brings himself to the admission that

one who is the subject of such an impulse does not know that his act is wrong; that one who does know the right and has power to choose the right over the wrong, this very knowledge involving and including power of self-control; that so the rules laid down by the law ought to be construed; that the test of "knowledge that an act is wrong" is the best and most proper test of accountability, and that such is the test by the law of the land. He says: "Knowledge and power are the constituent elements of all voluntary action, and, if either is seriously impaired, the other is disabled. It is as true that a man who can not control himself does not know the nature of his acts as that a man who does not know the nature of his acts is incapable of self-control."

I admit the existence of irresistible impulse, and its efficacy to exonerate from responsibility, but not as consistent with an adequate realization of the wrong of the act. It is that uncontrollable impulse produced by the disease of the mind, when that disease is sufficient to override the reason and judgment, and obliterate the sense of right as to the act done, and deprive the accused of power to choose between them. This impulse is born of the disease, and when it exists capacity to know the true nature of the act is gone. This is the sense in which "irresistible impulse" was defined in *Hopps* v. *People,* 31 Ill. 385, and *Dacy* v. *People,* 116 Ill. 556 (6 N. E. Rep. 165).

It seems to me to be very dangerous to life to tell juries that a party may know the nature of his murderous act, and know and be conscious that it is wrong and criminal, and yet be excusable if he did the act at the command of irresistible impulse; thus eliminating the knowledge of the wrong of the act as an unessential, unimportant element in the test. I do not regard it essential to the safety of the parties accused.

The operations of the human mind are wonderful, mysterious, and occult. Insanity is one of its melancholy and impenetrable conditions. Its types and phases are infinite and dark. Volumes upon volumes have been compiled by writers upon medical jurisprudence, mental philosophy, and law to pierce its depths, and find the general rules which

shall tell criminal courts what degree and character of insanity shall avail to excuse crime ; but no general rule universally applicable has been or can be found, because, as Mr. Bishop says, it is not in the nature of the subject to extract such a rule from it. I know of no better rule than the "right and wrong" test as above stated. Hence I do not think instruction twenty one is good in law.

There is another objection to instructions seventeen and twenty one, in that there was a theory presented by the evidence that before the killing of the deceased the prisoner had taken laudanum ; and if he was under its intoxication, produced by the voluntary use of the drug, that intoxication would furnish him no excuse. These instructions do not insert that theory as an element of the hypotheses presented by them, but disregard and ignore it, and are bad for that cause. *State* v. *Robinson,* 20 W. Va. 713 ; *State* v. *Welch, supra,* p. — (15 S. E. Rep. 419).

An objection to James Kelly's competency as a juror is not insisted on in the brief of counsel, and is not tenable. Nor is the motion to quash the indictment because of irregularity in the formation of the grand jury, or other cause, insisted on. No irregularity as to the grand jury appears.

Did the court err in refusing a new trial because the verdict was contrary to evidence and law ? This involves the merits of the case upon the evidence before the jury; but it is unnecessary to elaborate the voluminous evidence, or even any of the facts touching the merits of the case. Suffice it to say that Allen Harrison, the prisoner, was about twenty six years of age. Having some difficulty with his father he left his home, and was a homeless wanderer, and was kindly taken under the roof of Frank Adams, where he had been furnished a home, and treated very kindly as a member of the family for nearly a year before the tragedy, making no return but in small jobs of work. He fell in love with Bettie Adams, daughter of Frank Adams, and paid her frequent attention, but his love was not by any means reciprocated, as he was well aware. Miss Adams preferred another, and so gave Harrison to understand. He became exceedingly jealous of attentions to her from her lover, and when he would visit the house Harrison

would leave it, and quarrel with Miss Adams about her receiving attention from others. They had frequent "spats," in the language of the witness, on that occount. He declared his love to the girl's mother, but she told him that it would do him no good, and the best thing he could do was to leave the house; that her daughter was a mere child; that she wanted him to take his clothes and go; that her daughter would not stay at home; that talk was abroad in the neighborhood, and he was trying to keep other folks from going with her daughter. This she told him several months, and the last time about a week, before the killing of the daughter. The daughter feared him—feared that he would poison her. On Friday night he stayed with a neighbor, and there he secretly took a pistol from the drawer. He next day went to a store, and asked for cartridges. The pistol had two loads in it, but he seems to have wanted more cartridges to make sure work. He bought two two-ounce vials of laudanum. On Saturday he returned to the home of Adams, and at the kitchen door called for a drink of water, then walked through it into the front room, and Bettie Adams went into that room, just behind him, to take up ashes, and almost immediately the mother heard a shot, and the exclamation of her daughter, "Oh, ma, Allen has shot me!" and ran to her, took her in her arms, when Bettie sank to the floor, never spoke again, and died at once. The mother found Harrison in the room, pistol in hand, trying to shoot it again, it being an old pistol, out of order; and she said he had an unusually vicious look on his face. A little sister saw Harrison place the pistol close to the back of the deceased, and fire. He went to the woods close by, threw the pistol by a log, and was found in a few hours, lying down, with coat under his head. He declared he did not know why he had done the act. He wanted them to take an axe. and kill him, as he had done so dreadful an act. He said he shot the deceased in the breast as she rose up from raking up ashes, and as she turned he shot her in the back. Afterwards, when being conveyed to jail, he was asked, if it were to do over again, would he do it? and answered, "Yes, I would;" that he was not sorry for it, or ashamed of it, but was ashamed for anybody

to see him. The mother requested.him to go to see her child's dead body, but he declined to do so. On the way to jail he unloosed the rope with which he was tied, and ran a short distance, trying to escape. Either before or after the act he took laudanum, probably a large quantity, and vomited several times after his arrest, appearing sick and weak. The only defence was insanity. It was a question for the jury, and they found against it, as we think, properly.

Here is a ruthless, cruel murder of a child a little over fifteen years.of age, simply because of unrequited love and jealousy. There is no evidence at all adequate to sustain the plea of insanity. The prisoner had practiced masturbation, and there was evidence tending to show that he was afflicted with *melancholia* caused by it; but the great volume of evidence is utterly insufficient to show any want of capacity to excuse him. The attempt to commit suicide, if he really attempted it, is the strongest evidence to support the insanity theory, but it does not show insanity necessarily. 1 Whart. & S. Med. Jur. § 636 ; *Coyle v. Com.*, 100 Pa. St. 573.

The theory of irresistible impulse was so little borne out by the evidence that it may be questioned whether the instruction based on it, even if correct in law, was relevant to the case. He deliberately and secretly prepared the pistol hours before the bloody and cruel deed. He knew that the girl did not love him, and that marriage with her was out of the question. It is simply another instance of the many in the annals of criminal law, where a man murders a woman because she will not reciprocate.his love, and because of intense jealousy, perhaps mingled in this case with malice, because he had been bidden to leave the house on her account. Solemn as is the judgment, we are compelled to affirm it.

As the day fixed for the execution of the sentence has passed, the case is remanded to the Circuit Court, with direction to cause the defendant to be brought before it, and to fix another day for the execution of the judgment.

Affirmed.