# CHARLESTON

## SMITH V. PETERSON.

. Submitted June 12, 1911.   Decided November 26, 1912.

1.  EQUITY—*Pleading—Demurrer.*
    A general demurrer to a bill setting forth two grounds of relief, one sufficient and the other insufficient, is properly overruled.  (p. 366).

2.  SPECIFIC PERFORMANCE—*Burden of Proof—Validity of Contract.*
    The sufficiency of a written contract or memorandum of sale of real estate, relied upon in a bill for specific performance, and exhibited therewith, may be challenged by a demurrer to the bill.  (p. 366).

3.  SAME
    An answer to a bill for specific performance of a contract of sale of land, founded upon a written contract, exhibited therewith, and an alleged verbal contract, so far performed as to take it out of the statute of frauds, denying the sufficiency of the written contract on the ground of uncertainty, and also the existence of any contract, either written or verbal, and also the alleged acts of part performance, casts upon the plaintiff the burden of proving a written contract, good under the statute of frauds, or part performance of a verbal contract, sufficient to take it out of said statute.  (p. 366).

4.  SAME—*Contracts Enforceable—Certainty.*
    A contract for the sale of land, ambiguous as to whether the parties intended a sale of the whole of the tract, to which it relates, or only a part thereof, and incapable of reduction to certainty by the aid of extrinsic evidence, is void and specific performance thereof cannot be enforced.  (p. 367).

5.  FRAUDS, STATUTE OF—*Operation of Statute—Part Performance.*

To take a case out of the statute of frauds, on the ground of part performance, the plaintiff must show exclusive and continuous possession, and valuable and substantial improvements or an altered situation, incapable of compensation in money, all clearly under and in pursuance of the contract and in reliance thereon in good faith.    (p. 369).

Appeal from Circuit Court, Wetzel County.

Bill in equity by H. L. Smith and others against B. Walker Peterson and others.  From a decree for defendants, plaintiffs appeal.

*Affirmed.*

*J. V. Blair* and *Thos. P. Jacobs,* for appellants.

*S. Bruce Hall* and *H. M. Russell,* for appellees.

POFFENBARGER, JUDGE:

A bill in equity, filed in the circuit court of Wetzel county, by H. L. Smith, L. G. Robinson and J. S. Robinson, against B. Walker Peterson, for the specific performance of an alleged written contract for the sale of certain lands, executed by one Thomas Tucker, describing himself as agent of William F. Peterson, the agent of Samuel Fox, administrator of George Fox, and dated October 29, 1887, was dismissed on final hearing, after demurrer, answer and proof taken and filed, on the theory that the contract is void for uncertainty.

The written contract, exhibited with the bill, reads as follows: "Octo. the 29th, 1887.  I, Thomas Tucker, agent of Wm. F. Peterson the agent of Samuel Fox, Administrator of Geo. Fox, M. D., of Phila. with the will annexed, hereby agree as said agent that Henry Smith shall have the refusal to purchase the land between the land of Jacob Morgan and land sold to John T. Starkey and the ridge next to Sodam and should be sold to no others unless said Smith refuses to buy at such terms as others lands are sold at and if said Smith cuts and takes any timber 'of' before he buys he is to account to said Fox or his agent for the value thereof.  Given under my hand and seal this day and year above 'riten.'

THOMAS TUCKER,
*Agent for the above named parties.*    (Seal)."

The bill charges that, soon after the execution of the contract,

Smith took possession of the lands, and, later assigned his contract to L. G. Robinson who, by her tenants and agents, entered upon the same and held possession thereof. It is also alleged that, soon after the execution of the paper above set forth, Tucker and Smith met and agreed upon the price of the land, or rather ascertained the prevailing price of the Tucker land or in the community to be five dollars an acre, and Smith purchased the same at that price, estimating the quantity at about 300 acres.

Inasmuch as the bill claimed part performance of the contract so as to take it out of the statute of frauds the demurrer was no doubt properly overruled. Insufficiency of the written contract, such as uncertainty in its terms or omission of an essential element thereof, if any, were available on demurrer; but, as the demurrer was to the whole bill, if any part of it made a case for relief, it was necessary to overrule the demurrer. Hence, even though the written contract was void, the verbal contract set up and alleged to have been performed in part, so as to take it out of the statute of frauds, taken as true on demurrer, entitled the plaintiff to relief. If a bill contains two or more matters of suit, one good, one bad, the general demurrer thereto must be overruled. *Trough* v. *Trough,* 59 W. Va. 464; *Miller* v. *Hare,* 43 W. Va. 647; *Gay* v. *Skeen,* 36 W. Va. 582.

The answer of Peterson denies specifically and positively every material allegation of the bill. It admits no contract of any kind. On the contrary, it denies the existence of either a written or a verbal contract, and also the facts alleged by the plaintiffs as constituting part performance. This answer challenges the sufficiency of the alleged written contract under the statute of frauds, by denying the existence of any contract. Denial of the existence of any contract, in any proper manner, casts upon the plaintiff the burden of proving one sufficient in law. "If the answer denies generally the making of any such agreement as that alleged in the bill, the plaintiff must have an agreement valid under the statute." *Barrett* v. *McCallister,* 36 W. Va. 738; *Capehart* v. *Hale,* 6 W. Va. 547. To the same effect see *Eaves* v. *Vial,* 98 Va. 134. If any contract alleged in the bill, even though verbal, had been admitted by the answer, then it would have been necessary to specifically claim the

benefit of the statute. *Barrett* v. *McCallister; supra; Fleming* v. *Holt,* 12 W. Va. 143. But there is no admission whatever in this answer. It assails the written contract in specific terms, saying it is void on its face for uncertainty. In this state of the case, the right of the respondent to claim the protection of the statute is clear.

It becomes necessary, therefore, to say whether the written contract, relied upon and exhibited with the bill, is good under the statute of frauds. In form it is an option, giving to Smith the refusal, or exclusive right, to purchase the land, without fixing any time within which he should do so. Though it is unilateral and conditional, a subsequent verbal acceptance would convert it into a contract, mutual and binding upon both parties, if it contained all the elements necessary to a contract or memorandum of sale of land, required by statute. *Barrett* v. *McCallister, supra; Watson* v. *Coast,* 35 W. Va. 463. The vital inquiry, therefore, is, whether the paper relied upon contains all of those elements.

From the extraneous evidence adduced, it is possible to find a strip of land, lying between the Jacob Morgan land and a ridge on the south side of a stream known as Price's Fork. It is more than a mile and a half long and has an average width of probably not more than about one-third of a mile. The John T. Starkey land, referred to in the description, is an irregular oblong tract of 25 or 26 acres, adjoining it on the south and on top of the ridge, a little east of the center. The crooked line, separating it from the land in controversy, is 192 poles long. The entire southern line of the subject matter of this suit is 462 poles long, and the Starkey land adjoins the narrowest portion thereof. Neither the Morgan land nor the ridge bounds it on the west and nothing else is designated as a boundary or monument at that end. The ridge does not seem to bound it on the east, and nothing is called for in the paper that could constitute an eastern boundary. At the date of the contract, there was a village, called Sodom, now known as Smithfield, on other land near the northwest corner. The ridge here described is probably a little nearer Sodom than a similar one on the north side of Price's Fork, but it is nearer the Morgan land than it is to Sodom, and the north line of the Starkey land

follows its crest. "The ridge next to Sodom" may mean so much' of the ridge as lies rather between the Starkey land and Sodom, or, to be more accurate, west of the Starkey land, as contradistinguished from the balance of the ridge, lying east thereof. It may mean this or so much of the ridge as lies opposite the southern line of the Morgan land, including portions thereof both east and west of the Starkey land. In the former case, the paper would call for about three-fourths of the tract, and, in the latter, all of it. Support to the former view is found in the improbability of intent to call for two boundaries at the same point, the Starkey line and the ridge which coincides with it. Likely the draftsman meant the land lying between the Morgan land, on one side, and the Starkey land and the ridge west of it, or next to Sodom, on the other. East of the Starkey land a James Morgan tract might have been called for as a southern boundary, as the Starkey tract was, but there is no reference to it, nor to others on the eastern line as surveyed for the purposes of this suit. While this may be the true interpretation of the instrument, read in the light of facts, disclosed by the extraneous evidence, nobody can say, with any degree of certainty, whether the parties had in contemplation about three-fourths of the tract or all of it.

The uncertainty thus disclosed respects the quantity of the land alleged to have been sold, a vital element of the contract, and is necessarily fatal. It is not relieved by the obviousness of intent to sell something. To say the lesser quantity at least was sold is not sustained by the terms of the paper. There is perhaps equal ground for the assertion of a sale of the larger quantity. In every case of an uncertain contract, there is a manifestation of intent to sell something, but it avails nothing, because of the inability of the court to ascertain, from the terms used and the facts disclosed, just what the alleged vendor intended to sell and the alleged vendee intended to buy. The fatal absence of evidence of an agreement of minds upon a certain thing exists, notwithstanding a manifest effort to state an agreement as to something. In *Mathews* v. *Jarrett*, 20 W. Va. 415, there was a writing, and the extrinsic evidence showed Mathews was to have ten acres of land, on which he resided in a house built thereon by him, but the paper failed to give its boundary

lines. The writing certainly disclosed intent to sell so much of the land as was covered by the house, but its uncertainty as to additional land was fatal to it. Further illustrations of the operation of the rule will be found in Fry on Spec. Perf., pp. 191 et seq., and Watterman on Spec. Perf., sec. 154, 156. Uncertainty in a contract of sale of land as to whether the vendor reserved the timber was fatal to a bill for specific performance in Reynolds v. Waring, You. 346.

The position of appellant's counsel is not sustained by Kight v. Kight, 64 W. Va. 519, nor Crotty v. Effler, 60 W. Va. 258. In the former, the writing minutely described the line on one side of the tract, giving its termini, and then called for a parallel line far enough removed to reach improved land and cut off about 70 acres. In the latter the memorandum described the land as a piece that had been sold to Effler by a certain company, and the deed, showing that sale and fully describing the land, enabled the court to see clearly just what land it was.

Tucker as agent may have intended to sell Smith all the land he claims, as the land all round it seems to have been previously sold. The general situation and circumstances indicate such intent, as they did, in Mathews v. Jarrett and many other similar cases, but the extrinsic facts cannot be used to supply fatal defects in the written contract. The paper itself must contain enough to enable the court, with the aid of extrinsic evidence, to say the words of the instrument select and fix a certain thing and no other, as the subject matter of the contract. Here the terms, aided by the extrinsic evidence, leave it uncertain as to how much of the land Tucker intended to sell.

Is the verbal contract alleged and proved by the testimony of Smith and Robinson enforcible on the ground of part performance, taking it out of the statute? We think not. Under permission given by Tucker as agent for Fox, Smith and Robinson took timber from this land, before any verbal contract of sale was, or is said to have been, made. Smith says the terms of the sale were settled in the spring of 1888. Robinson testifies that his teams and men took timber from the land in the winter of 1887 and 1888, under the direction of Smith, the latter claiming to have bought it. The buildings on the land are frail things, such as are usually put up for logging or timber

purposes. The testimony is not clear as to when they were built. The optional contract tacitly gave, or assumed, permission to Smith to cut and remove timber before purchasing the land. He began before he purchased it. These buildings may have been erected merely for logging purposes. It is not clear that they were put up under the alleged contract of purchase. No land of any consequence has been cleared, and none at all fenced. The purchaser has not made the land his residence or used it in connection with, or as a part of, his farm or homestead, and it is quite apparent that all he has done on the land is compensable in damages. Besides, his possession, if any, had been litigous for 'a good while before he instituted this suit. Peterson has leased the land for oil and gas purposes. Oil had been found and the royalties paid to Peterson. While the lessee, the South Penn Oil Company, took a lease under the Smith claim, as well as one from Peterson, all royalties were paid to the latter. The possession, alleged in the bill, if sufficient in other respects, has not been exclusive. On the whole, we think it has not been such as to make out a case of part performance. Besides, there is no claim of payment of more than $100.00 on the purchase money, and this is disputed and the evidence of it not clear. Smith worked out taxes, due on the Fox lands, for the year 1887, and was allowed credit therefor by Tucker to the amount of about $100.00, but this may have been applied on other purchases, as Smith had made others through Tucker, though he says it was applied on the purchase money of the lands in controversy.

It must clearly appear that improvements, relied upon for part performance, were made under and in pursuance of the purchase, and not otherwise. *Steenrod* v. *Wheeling &c. R. Co.,* 27 W. Va. 1; *Lorentz* v. *Lorentz,* 14 W. Va. 761; *Harrison* v. *Harrison,* 36 W. Va. 556; *Campbell* v. *Fetterman,* 20 W. Va. 398; *Middleton* v. *Selby,* 19 W. Va. 167; *Stone* v. *Hill,* 52 W. Va. 69; *Gallagher* v. *Gallagher,* 31 W. Va. 9. The improvements must have been substantial and valuable. *Harrison* v. *Harrison,* cited. The possession must have been exclusive and continuous. *Woods* v. *Stevenson,* 43 W. Va. 149; *Miller* v. *Lorents,* 39 W. Va. 160; *Gallagher* v. *Gallagher,* cited. We are clearly of the opinion that the possession and improvements, relied upon here, are

insufficient.  There must be more than mere technical possession.  The acts done must be such in nature as to work an altered situation on the part of the vendee, not compensable in money, and make non-completion of the contract on the part of the vendor inequitable or fraudulent.

Seeing no error in the decree, we affirm it.

*Affirmed.*