526 S.E.2d 43

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Lowell Eugene PAYNTER, Defendant Below, Appellant.**

### No. 26205.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 5, 1999.

Decided Dec. 10, 1999.

Dissenting Opinion of Justice Maynard Dec. 15, 1999.

---

Richard E. Holicker, Assistant Public Defender, Charleston, West Virginia, Attorney for the Appellant.

Darrell V. McGraw, Jr., Attorney General, David P. Cleek, Senior Deputy Attorney General, Charleston, West Virginia, Attorneys for the Appellee.

DAVIS, Justice:

Lowell Eugene Paynter appeals his conviction for second-degree murder. Mr. Paynter first argues that the trial court erred when it failed to grant his request for a mental competency evaluation, which request was made after Mr. Paynter had already been found competent by a psychologist. In addition, Mr. Paynter contends that his due process rights were violated by the State's loss or destruction of certain, possibly exculpatory, evidence. We find that the court erred in failing to order a psychiatric evaluation of Mr. Paynter because his first competency evaluation did not comport with W. Va.Code § 27–6A–1(a) (1983) (Repl.Vol.1999). For this reason, we reverse the conviction and remand this case for a new trial. In addition, however, we conclude that a cautionary instruction given by the court was sufficient

to protect Mr. Paynter's due process rights with regard to the missing evidence.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The appellant, Lowell Eugene Paynter (hereinafter "Paynter"), defendant below, a forty-six year old paraplegic who is confined to a wheelchair, spent the night of July 25, 1996, and early morning of July 26, 1996, at his home in Mingo County drinking heavily with the victim, Thea Renee Taylor (hereinafter "Ms. Taylor"), his live-in girlfriend. Sometime in the early morning hours of July 26, 1996, Ms. Taylor suffered a single, fatal, gunshot wound to the left side of her head. Thereafter, Paynter telephoned his ex-wife, who, accompanied by various others, drove to Paynter's house and then called 911 and reported that Ms. Taylor had committed suicide.

Among the several law enforcement officers responding to the scene was Deputy Barry J. Blair (hereinafter "Deputy Blair") of the Mingo County Sheriff's Department. While at the scene, Deputy Blair used a gunshot residue kit to obtain samples from Ms. Taylor's hands to be tested for gunshot residue. The samples were sent to the West Virginia State Police Forensic Laboratory for testing. However, they were not tested as the forensic chemist concluded that "[t]hey [did] not have a probative value since they originated from surfaces which were in close proximity to the discharge." Thereafter, the samples were lost or destroyed.[1]

On August 7, 1998, a Mingo County Grand Jury returned an indictment charging Paynter with the murder of Ms. Taylor.

Prior to Paynter's trial in the Circuit Court of Mingo County, his counsel filed a "MOTION FOR MENTAL STATUS EXAMINATION" requesting a *psychiatric* examination pursuant to W. Va.Code § 27–6A–

---

1. Due to this loss or destruction, Paynter was unable to secure an independent evaluation of the samples. Consequently, the trial court instructed the jury that:

 In this case, gunshot residue samples were taken from the left hand of the decedent, Thea Renee Taylor. However, the State of West Virginia failed to test those samples. Further-

 more, those samples were lost or destroyed by the State before the Defendant was given the opportunity to test the samples.

 Because of these facts, this Court instructs you that you may assume as a fact of evidence—just as if someone had testified to it—that gunshot residue was present on Ms. Taylor's left hand.

1(a) (1983) (Repl.Vol.1999), to determine, *inter alia*, if Paynter was competent to stand trial. Thereafter, the circuit court ordered that Paynter undergo a *psychological* evaluation to determine, in part, Paynter's competency to stand trial. In its order, the court expressed its belief that Paynter "may be incompetent to stand trial or may not be criminally responsible by reason of mental illness, retardation or addiction, pursuant to W. Va.Code § 27–6A–1(a), as amended. . . ."

In accordance with this order, Paynter was evaluated by Timothy S. Saar, Ph.D., a licensed *psychologist.* By letter dated July 23, 1998, Dr. Saar expressed his opinion that Paynter was competent to stand trial.[2]

Paynter's competence was not further addressed on the record until pre-trial proceed-

ings conducted on the day his trial was to begin.[3] At that time, Paynter's counsel informed the trial judge that Paynter was delusional, had heard voices, and believed that the prosecuting attorney represented him. Although Paynter's counsel did not expressly request another competency evaluation, the record clearly indicates that Paynter's competence was being raised for this reason. Furthermore, the trial judge informed Paynter's counsel that any such motion would be denied.[4]

At the conclusion of trial, Paynter was convicted of second-degree murder. By subsequent order, entered September 15, 1998, the Circuit Court of Mingo County sentenced Paynter to a definite term of thirty-five

---

**2.** Dr. Saar diagnosed Paynter with "Alcohol dependence, early full remission in a controlled environment," and "Adjustment Disorder with depressed mood, chronic." In addition, Dr. Saar concluded that "Mr. Paynter has no difficulty describing the charges against him nor does he appear to have any significant difficulty communicating."

**3.** Apparently, counsel first raised concern over Paynter's mental status to the judge by phone the previous evening, but there is no evidence regarding the phone call contained in the record before this Court.

**4.** The judge and counsel had the following exchange:

MS. MCCUNE: Your Honor, when we visited our client, starting at jury selection and most blatantly when we visited our client at the jail for four hours yesterday afternoon, we believe that he was delusional.

He said that—he talked to us about hearing the tape in court. He told us about voices on the tape that were not on the tape. He told us that Mr. Smith [the prosecuting attorney] was representing him and that we weren't. Mr. Smith was doing a better job for him and we were against him.

With regard to jury selection, when we told him who we thought was a good juror based upon our research, he'd say "Well, then, I don't want him because you all are trying to railroad me." Or some word like that. He really seemed real off base last night and I've been practicing for 19 years and I'm not just trying to mislead the Court. It was a little bit scary.

He said he trusts Mr. Holicker a little bit more than he trusts me and you can make your own observations about that.

MR. HOLICKER: Your Honor, he was absolutely convinced that the audio t[a]pe that we played in Court the other day was manufac-

tured by the State, that it contained conversations that happened at his home and conversations that happened in the prosecutor's office were edited together.

THE COURT: He should be alleviated because the tape was suppressed.

MS. MCCUNE: We talked to him about that and he didn't understand what we were trying to tell him about that.

MR. HOLICKER: But, Your Honor, the point of him saying that isn't that the tape was manufactured. It is that he was delusional.

MS. MCCUNE: The other thing, Your Honor, is that as I always do in these cases since I didn't have a written plea, I wrote out what the plea was. I wrote out that he was refusing it and what our advice had been and he refused to write it. He refused to write on it that "I refuse to sign it." . . . .

. . . .

THE COURT: There's nothing that I have seen about his demeanor that I've had an opportunity to observe although I haven't had the intimate conversations with him that you have. But in observing him, in this case and during these pre-trial proceedings, I have seen nothing about his conduct that would cause me to have him to be examined again in this case.

The record should reflect that he has already been examined and has been deemed mentally competent. I think that what Mr. Paynter may be suffering is a little bit of pretrial anxiety and frustration.

. . . .

Any motion for secondary mental competency exam will be denied. Any motion to withdraw will be denied.

MR. HOLICKER: I would just like the record to be clear that I don't believe he's competent to participate in his defense or to testify in his own defense.

years. It is from this sentencing order that Paynter now appeals.[5]

## II.

## STANDARD OF REVIEW

 In this appeal, we are asked to interpret W. Va.Code § 27–6A–1(a) (1983) (Repl.Vol.1999) and to determine whether Paynter's due process rights were violated due to the State's loss or destruction of certain evidence. To the extent that we are asked to interpret a statute or address a question of law, our review is *de novo.* "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995). Moreover, "[i]n reviewing challenges to the findings and conclusions of the circuit court, we apply a two prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard." Syl. pt. 2, in part, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997).

## III.

## DISCUSSION

### A. *Psychological Evaluation*

Paynter argues that the mental status examination he underwent was insufficient as it was conducted by only a psychologist when W. Va.Code § 27–6A–1(a) requires that a mental status examination be conducted by a psychologist and a psychiatrist, or one or more psychiatrists. The State responds that defense counsel failed to object to the sufficiency of the exam.

 **1. Appealability of error.** Before considering the substantive issue raised, we first address whether this error was preserved. The State is correct that the record

contains no express objection by the defendant as to the sufficiency of his psychological competency exam. In this regard, we have frequently espoused the general rule that

> "[t]he Supreme Court of Appeals is limited in its authority to resolve assignments of nonjurisdictional errors to a consideration of those matters passed upon by the court below and fairly arising upon the portions of the record designated for appellate review." Syl. Pt. 6, in part, *Parker v. Knowlton Const. Co., Inc.,* 158 W.Va. 314, 210 S.E.2d 918 (1975).

Syl. pt. 2, *Trent v. Cook,* 198 W.Va. 601, 482 S.E.2d 218 (1996). Because the trial court was not asked to address the specific issue of its failure to order a psychiatric evaluation, we may only consider this question if it falls within the plain error doctrine. In describing the plain error doctrine, we have explained that:

> Historically, the "plain error" doctrine "authorizes [an appellate court] to correct only 'particularly egregious errors' ... that 'seriously affect the fairness, integrity or public reputation of judicial proceedings[.]' " *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 12 (1985). (Citations omitted). Plain error warrants reversal "solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816, 827 n. 14 (1982).

*State v. Miller,* 194 W.Va. 3, 18, 459 S.E.2d 114, 129 (1995). Moreover, we have set forth the elements required for this Court to recognize plain error by holding "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. pt. 7, *Miller.*

We find that the present issue may properly be addressed under the plain error doctrine. First, as we explain below in this

---

**5.** On August 17, 1998, Paynter filed a "MOTION TO SET ASIDE THE VERDICT, JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT, OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL." The record submitted on appeal contains no ruling by the circuit court expressly denying Paynter's motion. However, because the sentencing order was entered after the aforementioned motion was filed, we assume the motion was denied.

opinion, we find the court erred in failing to follow the requirements of W. Va.Code § 27–6A–1. Second, in light of the plain language of the relevant portion of W. Va.Code § 27–6A–1 and existing case law on this topic (which is also discussed below), we find the error was plain. Third, we have previously stated that "a person cannot be tried, sentenced or punished while mentally incapacitated," and "adequate state procedures must exist to make certain that a legally incompetent accused is not convicted." *State v. Demastus,* 165 W.Va. 572, 582, 270 S.E.2d 649, 656 (1980) (citing *State v. Harrison,* 36 W.Va. 729, 15 S.E. 982 (1892), *Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956), *Pate v. Robinson,* 383 U.S. 375, 386, 86 S.Ct. 836, 842–43, 15 L.Ed.2d 815, 822–23 (1966), and *Martin v. Estelle,* 492 F.2d 1120 (5th Cir.1974)). It has also been said that "it is legally impermissible for a person who is mentally incompetent to be tried, convicted or sentenced. This is a fundamental guarantee of due process." 2 Franklin D. Cleckley *"Handbook on West Virginia Criminal Procedure"* II–125 (2d ed.1993) (citing *State v. Cheshire,* 170 W.Va. 217, 292 S.E.2d 628 (1982), *State v. Bias,* 177 W.Va. 302, 352 S.E.2d 52 (1986) and *State v. Arnold,* 159 W.Va. 158, 219 S.E.2d 922 (1975), *overruled on other grounds by State v. Demastus,* 165 W.Va. 572, 270 S.E.2d 649). A circuit court's failure to follow the proper statutory procedures to preserve this fundamental due process guarantee affects a defendant's substantial rights. Lastly, such failure creates a greater risk that mentally incompetent individuals will be improperly subjected to trials wherein they may be convicted and sentenced in violation of their due process rights, thus, seriously affecting the fairness, integrity and public reputation of judicial proceedings. For these reasons, we proceed to consider the particular issue raised by Paynter.

**2. Adequacy of Competency Evaluation.** Turning now to the issue of whether the circuit court erred in ordering only a psychological evaluation to determine Paynter's competence to stand trial, we first note that Paynter filed a motion requesting a *psychiatric* evaluation to determine his competence to stand trial pursuant to W. Va. Code § 27–6A–1(a), which states in relevant part:

> Whenever a court of record . . . believes that a defendant in a felony case or a defendant in a misdemeanor case in which an indictment has been returned, or a warrant or summons issued, may be incompetent to stand trial or is not criminally responsible by reason of mental illness, mental retardation or addiction, it may at any stage of the proceedings after the return of an indictment or the issuance of a warrant or summons against the defendant, order an examination of such defendant *to be conducted by one or more psychiatrists, or a psychiatrist and a psychologist. . . .*

(emphasis added).

The language of this statute is plain and unambiguous and therefore must be applied and not construed. Syl. pt. 3, *Michael v. Marion County Bd. of Educ.,* 198 W.Va. 523, 482 S.E.2d 140 (1996) (" 'Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation.' Syl. Pt. 2, *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968)."). W. Va.Code § 27–6A–1(a) provides for only two methods of conducting a mental examination to determine a defendant's competency: (1) an examination by one or more psychiatrists or (2) an examination by a psychiatrist and a psychologist. We have previously considered the requirements of this statute and held:

> In the interests of future judicial economy, whenever a trial court is confronted with a Motion for Mental Status Evaluation and orders an examination believing that the defendant may be incompetent or insane, the court should order that said examination shall be conducted by "one or more psychiatrists, or a psychologist *and* a psychiatrist", in accordance with W. Va. Code, 27–6A–1 [1983]. [Emphasis added.]

Syl. pt. 2, *State v. Moore,* 193 W.Va. 642, 457 S.E.2d 801 (1995). Although the *Moore* Court concluded that the trial court did not commit reversible error in ordering only a psychological evaluation, that case is distinguishable from the case *sub judice.*

In *Moore*, as in this case, the defendant's lawyer made a motion for a *psychiatric* examination and the circuit court granted the motion but nevertheless ordered a *psychological* examination. However, the prosecuting attorney then suggested to the court that W. Va.Code § 27–6A–1 required that the examination be conducted by a *psychiatrist*. The court disagreed with the prosecutor. The defense then *"expressly stated that it had no objection to the court's decision." Moore* at 645, 457 S.E.2d at 804 (emphasis added). Defense counsel also declined to challenge the resulting report finding the defendant competent to stand trial. In addition, and the most significant difference between *Moore* and the case *sub judice*, the defense lawyer in *Moore* stated at a subsequent arraignment hearing: " 'I believe that [the defendant] knows and understands what he is accused of and can answer any questions that the Court has at this present time.' " *Moore* at 646 n. 4, 457 S.E.2d at 805 n. 4.

After reviewing the above-described course of events surrounding the defendant's competency evaluation, this Court concluded "[w]e do not find it to be reversible error when the defense counsel repeatedly turns down opportunities to request a psychiatrist and waives his client's right to a full competency hearing." *Id.* The *Moore* Court further noted that " 'the trial judge did not have the responsibility to insure the psychiatric examination was conducted because it was not brought to his attention.' " *Id.* at 647, 457 S.E.2d at 806 (citation omitted).

■ In *Moore*, defense counsel not only failed to challenge the competency finding, but went on to admit that his client was competent. Here, on the other hand, Paynter's counsel revisited the issue of Paynter's competency to stand trial by informing the court of the delusional behavior exhibited by Paynter on the eve of trial. At this point, the trial court could have corrected its earlier failure to order a psychiatric evaluation

based upon the representations of Paynter's lawyers.

> "A judge may be made aware of a possible problem with defendant's competency by such factors as: *a lawyer's representation concerning the competence of his client;* a history of mental illness or behavioral abnormalities; previous confinement for mental disturbance; documented proof of mental disturbance; evidence of irrational behavior; demeanor observed by the judge; and, psychiatric and lay testimony about competency. *State v. Arnold, supra* 219 S.E.2d, at 926, citing: *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)."

*State v. Watson,* 173 W.Va. 553, 557, 318 S.E.2d 603, 607–08 (1984) (quoting *State v. Demastus,* 165 W.Va. 572, 582 n. 9, 270 S.E.2d 649, 656 n. 9 (1980)) (emphasis added). *Cf. State v. Flint,* 171 W.Va. 676, 301 S.E.2d 765 (1983) (finding no sufficient basis for psychiatric examination where only factor asserted as grounds for examination was lawyer's conclusion that defendant must have been mentally incompetent at time of crime because lawyer had been unable to find anyone to say defendant was anything but a normal boy).

■ Due to the profound importance of assuring that criminal defendants are not denied their due process rights by being subjected to trial, conviction or sentencing when they do not possess the requisite mental competence,[6] we hold that when a trial judge orders a competency examination under W. Va.Code § 27–6A–1(a) (1983) (Repl. Vol.1999), but the examination is not undertaken in the manner required by that statute, the court must grant a subsequent motion for a competency evaluation made by the defendant and order any such examinations as are necessary to comport with W. Va.Code § 27–6A–1(a).

---

**6.** In Syllabus point 1 of *State v. Milam,* 159 W.Va. 691, 226 S.E.2d 433 (1976), we declared: No person may be subjected to trial on a criminal charge when, by virtue of mental incapacity, the person is unable to consult with

his [or her] attorney and to assist in the preparation of his [or her] defense with a reasonable degree of rational understanding of the nature and object of the proceedings against him [or her].

In the case at bar, the trial court expressly stated that it believed the "[d]efendant may be incompetent to stand trial ... pursuant to W. Va.Code § 27–6A–1(a), as amended...." Having determined that Paynter may not be competent to stand trial, and having received a proper request for a mental examination from Paynter's counsel, the circuit court was without discretion to deny the request. "When a trial judge is made aware of a possible problem with defendant's competency, it is abuse of discretion to deny a motion for psychiatric evaluation. To the extent *State v. Arnold,* 159 W.Va. 158, 219 S.E.2d 922 (1975), differs from this rule, it is overruled." Syl. pt. 4, *State v. Demastus,* 165 W.Va. 572, 270 S.E.2d 649 (1980). *See also State v. Moore,* 193 W.Va. 642, 646, 457 S.E.2d 801, 805 (1995) ("Although the statute states that the court 'may' order an examination, we have previously held that the trial court has no discretion to deny a request for mental examination of a defendant if an *appropriate* request has been made. Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure,* Vol. II, at 131 (2d ed.1993)" (additional citations omitted)). However, the court ordered a psychological examination only, rather than an examination by "one or more psychiatrists, or a psychiatrist and a psychologist." Thereafter, Paynter's counsel alerted the court to their concern regarding his delusional conduct and competency to stand trial, and provided the court with a detailed description of Paynter's conduct.[7] Because the court had earlier failed to order a proper

evaluation under W. Va.Code § 27–6A–1, it erred in declining to grant Paynter's second request [8] for a competency evaluation.[9] We find this to be a reversible error as Paynter was denied the assurance that he would not be subjected to trial, conviction or sentencing at a time when he did not possess the requisite mental competence. We nevertheless proceed to consider Paynter's next assignment of error in order to provide the lower court with guidance on an issue that is likely to arise again in Paynter's re-trial.

### B. Gunshot Residue Samples

Paynter argues that his due process rights were also violated when the state lost or destroyed the gunshot residue samples that were taken from the hands of the decedent without examining the samples and without affording him an opportunity to examine them. Paynter contends that the evidence was vitally important to his case as it was the only physical evidence that could corroborate his claim of suicide.

The State responds that the issue is the existence or non-existence of bad faith on the part of the State and the effect of this loss of evidence on the fairness of the trial. The State also asserts that it is not clear that the lost evidence was exculpatory.

In Syllabus point 2 of *State v. Osakalumi,* 194 W.Va. 758, 461 S.E.2d 504 (1995), this Court held:

When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists

---

7. *See supra* note 4.

8. Although Paynter's counsel did not specifically request a second competency evaluation, this failure was due to the trial court's anticipatory denial of such a motion. *See supra* note 4.

9. Paynter also contends that he was denied substantive due process when the trial court failed to make a finding on his competency before proceeding to trial as required by W. Va.Code § 27–6A–1(d). Given our disposition of this case, we need not address this issue. However, we do note that:

A trial judge's failure to make a finding on the issue of a criminal defendant's competency to stand trial within five days after the filing of a report by one or more psychiatrists or a

psychiatrist and a psychologist in compliance with W. Va.Code, 27–6A–1(d) [1977], will not be considered to be reversible error requiring a new trial absent prejudice to the defendant resulting from such failure.

Syl. pt. 1, *State v. Church,* 168 W.Va. 408, 284 S.E.2d 897 (1981). Moreover, with regard to a trial judge's finding as to competency, we have also held:

In making any of the findings required by W. Va.Code, 27–6A–1, *as amended,* a trial court may not simply adopt as its own the recommendations of medical experts, but rather, based on an examination of the totality of the evidence, it should make an independent determination as to whether the defendant is competent to stand trial.

Syl. pt. 3, *State v. Milam,* 159 W.Va. 691, 226 S.E.2d 433.

when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either *West Virginia Rule of Criminal Procedure* 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.

In the present case, the first three elements of the *Osakalumi* test are not an issue. The question we must answer is whether the trial court's cautionary instruction was the proper consequence to flow from the State's breach of its duty to preserve the evidence. We believe that it was.

*Osakalumi* involved a death by gunshot that occurred while the victim was seated on a couch. As with this case, the defense asserted that the death was a suicide. At trial, the state attempted to show that the death resulted from murder by providing detailed information regarding the trajectory of the bullet through the couch upon which the decedent was located at the time he was shot. However, the couch had been discarded by the State prior to trial and without the defense having an opportunity to examine it. Furthermore, the State had failed to measure the proportions of the couch, the location of the bullet hole in the couch or the trajectory of the bullet. Similarly, no probative photographs were made of the couch or the bullet hole. Nevertheless, the State was permitted to admit the expert opinion testimony of the State medical examiner, Dr. Irvin Sopher, to support its murder theory.

Dr. Sopher had not personally examined the couch, but had reached his conclusion that the victim had been murdered based upon a diagram of the couch that had been prepared by a detective who participated in the murder investigation. The diagram, which contained no measurements of the couch or the location of the bullet, had also been lost. Consequently, Dr. Sopher recreated the detective's diagram from memory and testified, based in large part upon the alleged trajectory of the bullet through the couch, that the victim had been murdered. *Osakalumi* at 760–62, 461 S.E.2d at 506–08. The defendant was convicted and an appeal to this Court followed.

On appeal, the *Osakalumi* Court first determined that the State had breached its duty to preserve the couch. The Court then proceeded to consider what consequences should flow from the breach. After finding that the State had acted negligently, rather than in bad faith, in disposing of the couch, the Court next explained that the missing couch was a crucial piece of evidence considering the unreliability of the evidence presented as a substitute for the couch. *Osakalumi* at 768, 461 S.E.2d at 514. Finally, concluding that the other evidence produced at trial was insufficient to sustain the conviction, the *Osakalumi* Court stated:

> We recognize that the jury could have reasonably inferred from the remaining evidence that appellant might somehow have been involved in [the victim's] death. However, the record is clear that Dr. Sopher, whose testimony was so critical to the prosecution's case, could not have concluded that [the victim's] death was the result of homicide without the evidence of the trajectory of the bullet through the missing couch.

*Id.* Although a cautionary instruction had been given by the trial court, this Court concluded that, due to the unreliability of the evidence related to the couch, the instruction was not sufficient to protect the defendant's due process rights and, thus, awarded him a new trial. The Court stated that the "trial was so fundamentally unfair as a result of the admission of evidence regarding the destroyed couch that appellant is entitled to a

new trial." *Id.* Nevertheless, the Court observed that "reversal of conviction will not always be the appropriate consequence which should flow from the State's breach of its duty to preserve evidence." *Id.* at 768 n. 14, 461 S.E.2d at 514 n. 14.

The United States Supreme Court has also addressed this issue, but did not award a new trial under the circumstances with which it was presented. *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In *Youngblood,* semen samples collected by a physician using a sexual assault kit was of insufficient quantities to allow the defense to conduct its own testing or to permit additional testing requested by the defense to ascertain the blood type of the assailant. In addition, the State failed to refrigerate clothing worn by the victim at the time of the assault. When the State attempted to test the clothing more than a year after the assault, it was unsuccessful. Thus, all of the physical evidence collected after the offense merely confirmed that a sexual assault had occurred. It did not help to incriminate or exculpate the defendant. In response to the defendant/appellant's argument that his due process rights were violated by the State's conduct with respect to this evidence, the Supreme Court noted:

> The possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality [announced] in [*California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) ].... [W]e made clear in *Trombetta* that the exculpatory value of the evidence must be apparent "*before* the evidence was destroyed." [*Id.* at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422] (emphasis added). Here, respondent has not shown that the police knew the semen samples would have exculpated him when they failed to perform certain tests or to refrigerate the boy's clothing; this evidence was simply an avenue of investigation that might have led in any number of directions. The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. Cf. *Napue v. Illinois,* 360 U.S. 264, 269[, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217] (1959).

*Youngblood* at 56 n. *, 109 S.Ct. at 336 n. *, 102 L.Ed.2d at 288 n. *. The Supreme Court also noted that "the State did not attempt to make any use of the materials in its own case in chief." *Id.* at 56, 109 S.Ct. at 336, 102 L.Ed.2d at 288 (footnote omitted).

The Court went on to explain:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady* [*v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ], makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta, supra,* [467 U.S. at 486, 104 S.Ct. at 2533, 81 L.Ed.2d at 421] that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause ... as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the

, police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Id.* at 57–58, 109 S.Ct. at 337, 102 L.Ed.2d at 289.

Finally, in a concurring opinion, Justice Stevens outlined the specific factors upon which he based his opinion and stated "[m]ore significantly, the trial judge instructed the jury: 'If you find that the State has ... allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest." *Id.* at 59–60, 109 S.Ct. at 338, 102 L.Ed.2d at 290.

We now apply the *Osakalumi* factors for determining what consequences should flow from the State's breach of its duty to preserve the gunshot residue evidence with due regard for the analysis expressed by the Supreme Court of the United States in *Youngblood.* The first factor is the degree of negligence or bad faith involved. We find that Paynter has failed to establish that the State acted in bad faith. Paynter has not established that the State had any knowledge that the gun shot residue samples taken from the decedent would have exculpated him, nor has he provided any other evidence indicative of bad faith. Second, we note that, unlike *Osakalumi*, the State did not use the lost evidence, here gunshot residue, in its case in chief. Moreover, the cautionary instruction given in this case was more beneficial to the defense than was the instruction given in *Youngblood.* Finally, we conclude that the other evidence produced at the trial was sufficient to sustain the conviction.

## IV.

### CONCLUSION

For the foregoing reasons, we reverse Paynter's conviction of second-degree murder and remand this case for a new trial not inconsistent with this opinion.

Reversed and Remanded.

Judge ROBERT B. STONE, sitting by temporary assignment.

Justice SCOTT did not participate.

MAYNARD, Justice, dissenting:

(Filed Dec. 15, 1999)

I dissent because I do not believe that the circuit court erred in failing to order a second competency evaluation when there was no reliable evidence that the defendant was mentally incompetent to stand trial. Accordingly, I would affirm the conviction.

This defendant is malingering and manipulating the Court. To use a bad cliche, he is "crazy like a fox," and this Court fell for it. Let us look at the facts of this case. The defendant was convicted by a jury of second degree murder for shooting his girlfriend in the head during a drinking binge. Prior to trial, upon motion for a mental status examination, the defendant was evaluated by a psychologist who concluded that the defendant was competent to stand trial. The defendant's counsel were apparently content with the evaluation and its results. From that time throughout all of the pre-trial proceedings, the defendant was normal in demeanor and conduct. However, on the day before the trial, the defendant suddenly and conveniently became "delusional," "heard voices and believed that the prosecuting attorney represented him." The trial judge, based upon his observation of the defendant in all the prior proceedings, concluded, "I have seen nothing about his conduct that would cause me to have him to be examined again in this case."

The majority now reverses the defendant's conviction for second degree murder and remands for a new trial. Why? Simply because it finds, based on W.Va.Code § 27–6A–1(a), that the defendant's competency evaluation was inadequate because it was conducted by a psychologist instead of a psychiatrist. In other words, the defendant's conviction for shooting his girlfriend in the head is being reversed because of a technicality. This is the type of judicial decision which rightly outrages the public.

There is nothing in the record, *beyond the representations of the defendant's counsel,* to suggest that the defendant did not have the present ability to consult with his counsel

with a reasonable degree of rational understanding and factually understand the proceedings. Consequently, there was simply no bona fide doubt as to the defendant's competency to stand trial. Accordingly, no reason exists for this Court to conclude that the trial court abused its discretion in refusing to order a second competency evaluation.

For the above reasons, I respectfully dissent.