725 S.E.2d 569

STATE of West Virginia, Plaintiff
Below, Appellee

v.

Amos Gabriel HICKS, Defendant
Below, Appellant.

No. 35670.

Supreme Court of Appeals of
West Virginia.

Submitted March 29, 2011.

Decided April 14, 2011.

Sidney H. Bell, Esq., Prosecuting Attorney of McDowell County, Welch, WV, for Appellee.

Michael F. Gibson, Esq., Gibson, Lefler & Associates, Princeton, WV, for Appellant.

PER CURIAM:

This case is before this Court upon appeal of a final order of the Circuit Court of McDowell County entered on October 7, 2009. In that order, Amos Gabriel Hicks (hereinafter "the appellant") was sentenced to life imprisonment without mercy for his convictions of first degree murder, malicious assault, and conspiracy following a jury trial that began on July 20, 2009. In this appeal, he asserts that the circuit court erred in admitting testimony in violation of Rule 404(b) of the West Virginia Rules of Evidence.[1] He also argues that the evidence presented was insufficient to sustain his convictions. Based upon the parties' briefs and arguments in this proceeding, as well as the relevant statutory and case law, this Court is of the opinion that the circuit court did not commit reversible error and, accordingly, affirms the decision below.

## I.

### FACTS

On October 21, 2008, the appellant was indicted for first degree murder, malicious assault, and conspiracy. The State alleged that the appellant had hired thirty-five-year-old Mose Douglas Mullins, Jr. (hereinafter, "Mr. Mullins") to kill several people because they had stolen property from him. At trial, the State's primary witness was Mr. Mullins. While Mr. Mullins is not a party to this appeal, his criminal actions were so intrinsically tied with those of the appellant that he will be discussed to the extent necessary to explain the events that led to the appellant's arrest.[2]

At the appellant's trial, Mr. Mullins testified that he was a drug addict and that he sold prescription drugs that he purchased from the appellant, but that he often used more of the drugs than he actually sold. As a result, Mr. Mullins became indebted to the appellant for a significant sum of the money that he owed him for a large quantity of OxyContin pills. According to Mr. Mullins, he worked out a deal with the appellant whereby, in exchange for forgiveness of the debt, he agreed to kill several people who had allegedly broken into the appellant's home. Mr. Mullins testified that the appellant agreed to give him $5,000 for each murder.

The initial discussion between the appellant and Mr. Mullins concerning the plan to kill the individuals was explained by Mr. Mullins as follows:

Q. Okay. Did he later talk to you about his intentions toward Jeff Mullins and Chantel Webb?

A. Yes.

Q. Tell us about that.

A. Kind of—Kind of bear with me here because this is—this is the part that— that I am most ashamed of for myself,

---

1. Rule 404(b) of the West Virginia Rules of Evidence provides:

    Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

2. The crimes committed by Mr. Mullins, including the murder of Jamie Chantel Webb, as well as the malicious wounding of Jeffrey Mullins and Don Ball, have been discussed in detail in two prior opinions of this Court. *See State v. Waldron*, 218 W.Va. 450, 624 S.E.2d 887 (2005) and *State ex rel. Waldron v. Scott*, 222 W.Va. 122, 663 S.E.2d 576 (2008).

you know. We—I had went to his home, to [the appellant's] house, pick-up the drugs like I normally do, you know, drop the money off and, you know, pick up other drugs, and while I was there, I had helped—I was helping him put together a patio—like dinette set for outside. Okay? And I don't know, something—he was—he was really agitated that day whenever I got there, you know, and we were out I think in the front yard, and he—he said that—that he'd give me $20,000.00 for the whole—for the whole family, kill the whole—you know, get rid of the whole family, I mean, more or less in that tone. You know what I mean?

Mr. Mullins testified that at that moment, he was not sure if the appellant was serious or whether his comments were made out of anger due to the theft of his property. Approximately two weeks later, however, Mr. Mullins and the appellant spoke again with more specificity regarding the plan to "get rid of the whole family." Two of the individuals the appellant wanted killed were Jamie Chantel Webb (hereinafter, "Ms. Webb"), who was a twenty-two-year-old mother of two, and twenty-two-year-old Jeffrey Mullins, who is a cousin to Mr. Mullins.[3] Mr. Mullins explained:

A.... I was going back and forth, you know, to exchange the money for the drugs, but once we—the next time I went over, I asked him if he was serious about [murdering the individuals], and he said, yes, and he said, well, he said—he said—he said, $5,000 a piece, you know, any—anything that happened, you know, and I got to be honest with you.

At that time, I had messed up the drugs and the money again and was indebted to him again. Well, the debt had not been paid from the previous one, let me back up, and I said, well, look, I said, I'd take it on. I said that way I can—I can clear my debt, and I can get back in his graces; so, to speak, so that

I could get my drug connection going good again so that I could make money and drugs for myself again.

Q. When you tell us you'd messed up the drug money or drugs again, what do you mean by that? What had you done to get back in debt with [the appellant]?

A. Well, I had done—I had done more of the drugs than I could pay for.

Q. Used them yourself?

A. Yes.

Q. Can you tell us about how much you were in debt to [the appellant]?

A. Approximately, around $5,000.

When Mr. Mullins asked the appellant if he was serious about having the individuals killed and about the $5000.00 payment per person, he said the appellant responded by asking, "What kind of gun are you wanting, you want a rifle, or you want a pistol?" After stating that he wanted a pistol, the appellant then gave Mr. Mullins a Ruger 9mm, semiautomatic pistol to commit the murders. This was the same pistol that Mr. Mullins had purchased from the appellant on a prior occasion for $200.00; however, Mr. Mullins no longer owned the gun at that time as he had traded it back to the appellant in exchange for prescription medication.

Soon thereafter, on May 13, 2001, Mr. Mullins and his neighbor, James Waldron, were riding in Mr. Mullins' vehicle. When they saw Jeffrey Mullins, Don Ball (hereinafter, "Mr. Ball"), and Ms. Webb, Mr. Mullins approached them and offered OxyContin pills to them. They then made plans to meet at a secluded location to complete the transaction. After the two groups arrived at the location, Mr. Mullins retrieved the gun that had been provided by the appellant and shot Ms. Webb, Mr. Ball, and Jeffrey Mullins. Mr. Ball fled the scene with five gunshot wounds and eventually recovered. Jeffrey Mullins was shot in the head and left for dead, but survived and remains paralyzed as a result of

---

**3.** Since Mose Douglas Mullins, Jr. and Jeffrey Mullins have the same surname and are discussed numerous times throughout this opinion, in order to avoid any potential confusion of the two men, Mose Mullins will be referred to as "Mr. Mullins," while Jeffrey Mullins will be referred to as "Jeffrey Mullins" or "Jeffrey."

his injuries. Ms. Webb, however, was shot in the head and killed at the scene.[4]

During the appellant's trial, evidence was presented showing that after Mr. Mullins was arrested for the shootings, the appellant's sister-in-law, Josie Hicks (hereinafter, "Ms. Hicks"), and Mr. Mullins' wife, Pam Mullins (hereinafter, "Ms. Mullins"), went to Pineville, West Virginia, with $10,000.00 in cash to retain attorneys Timothy P. Lupardus and Sante Boninsenga, Jr., to represent Mr. Mullins. Mr. Lupardus testified at the appellant's trial that the two women came to his office and paid a substantial part of Mr. Mullins' attorney's fee in cash. He further testified that Ms. Mullins told him that she had to go to the appellant to get the remainder of the money necessary to pay the fee. This was confirmed by Mr. Mullins' testimony at the appellant's trial wherein he said that the money for his attorneys was delivered to his wife by the appellant's sister-in-law.

Mr. Mullins further testified at the appellant's trial that he shot and intended to kill Ms. Webb, Jeffrey Mullins, and Mr. Ball even though none of them had committed any wrong against him. He explained that he killed Ms. Webb and attempted to kill the others for the sole reason that he was in debt to the appellant due to the fact that he "had done more of the drugs [he had purchased from the appellant] than [he] could pay for." He believed that killing these people would allow him to clear his debt, get back in the appellant's good graces, and would result in his "drug connection going good again so that [he] could make money and drugs for [himself] again."

Jeffrey Mullins also testified at the appellant's trial. He testified that the appellant had confronted him on two occasions prior to the shootings. He explained that during the first confrontation, the appellant approached

him and accused him of being involved in the burglary of his home. Jeffrey told him that he was not involved in the theft. Then, approximately three weeks prior to the shootings, Jeffrey said that the appellant approached him at the S & M Market. Jeffrey was there with Ms. Webb, Ms. Webb's grandmother Lulabelle Webb, and Miranda Webb. He said the appellant got off his motorcycle, began walking toward him very fast, threw a punch at him, and told Jeffrey "You're a dead mother fucker." Jeffrey said that he "was scared to death" of the appellant and that he and the others left the area very quickly in Lulabelle's vehicle.

Trial testimony also established that the appellant had confronted Melissa Coleman (hereinafter, "Ms. Coleman") in a violent manner prior to the shootings. Mr. Mullins stated that upon seeing Ms. Coleman alone in her car in a remote area of the county, the appellant began beating on her car, yelling at her, and forced her out of her vehicle. The appellant then asked for a belt, which was supplied by Mr. Mullins. According to Mr. Mullins, the appellant struck her numerous times with the belt and told her "that if he found out that she was involved in the break-in, that he would kill her where she slept." Ms. Coleman testified that she remembered specifically that the appellant had beaten her twenty-seven times with the belt. She said that the beatings were "nonstop" and that he hit her so hard that "it sounded like a 9mm letting off." Ms. Coleman also testified that she was present during the burglary of the appellant's home. She said that she and Ms. Webb went to the appellant's home to purchase drugs, but upon learning that the appellant was not there, Ms. Webb broke into the home and retrieved several guns and two or three gold chains. She explained that she

---

4. Following the shootings, Mr. Mullins threw the bodies of Ms. Webb and Jeffrey Mullins over an embankment, and he and Mr. Waldron rode to a carwash where Mr. Mullins attempted to remove blood stains from the vehicle. The two men then disposed of the murder weapon and Mr. Mullins' blood-stained clothing. Next, Mr. Mullins drove them to a relative's house, to a convenience store, and then to their respective homes, which were located beside each other. When they ar-

rived home, the police were waiting for them and they were both arrested. Jeffrey Waldron was later convicted of voluntary manslaughter and sentenced to seven years in the penitentiary. Mr. Mullins entered a guilty plea to second degree murder and two counts of malicious assault and was sentenced to forty years for the murder, and two-to-ten years for each count of the malicious assaults, to run consecutively.

and Ms. Webb then sold several of the items to Roy Bolen.

Soon after beating Ms. Coleman with the belt, the appellant went to the home of Roy and Robin Bolen to recover some of the items that were stolen from his home and later sold to Mr. Bolen. Ms. Bolen testified that Ms. Coleman and Ms. Webb were the two individuals who brought the guns and a gold necklace to her home to sell. She also said that the appellant told her that he had whipped Ms. Coleman with a belt until she acknowledged that she had sold Mr. Bolen the guns. Ms. Bolen said the appellant then paid her husband for the return of his guns and left.

After hearing all of the testimony, the appellant was convicted of first degree murder without a recommendation of mercy, malicious assault, and conspiracy to commit murder as an accessory before the fact.[5] This appeal followed.

## II.

### STANDARD OF REVIEW

■ The appellant asserts that the circuit court erred in admitting testimony in violation of Rule 404(b) of the West Virginia Rules of Evidence. He further argues that the evidence presented at trial was insufficient to sustain his convictions. In Syllabus Point 1 of *State v. Paynter*, 206 W.Va. 521, 526 S.E.2d 43 (1999), this Court held, "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). This Court has also indicated that a circuit court's final order and ultimate disposition are reviewed under the abuse of discretion standard. Syllabus Point 1, *State ex rel. Hechler v. Christian Action Network*, 201 W.Va. 71, 491 S.E.2d 618 (1997). The more specific standards of

review applicable to each assignment of error will be incorporated into the discussion below.

## III.

### DISCUSSION

The appellant presents two assignments of error. Each alleged error will be discussed below.

#### A. Rule 404(b)

■ First, the appellant maintains that the State introduced testimony in violation of Rule 404(b) [6] of the West Virginia Rules of Evidence. In particular, the appellant asserts that the circuit court abused its discretion in determining that testimony from various individuals that referenced the appellant's alleged drug dealing was relevant to his prosecution for first degree murder, malicious assault, and conspiracy. The appellant concedes that the circuit court conducted a hearing on this issue as required by *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994); [7] however, he states that the circuit court committed error by "conducting meaningless and *pro forma* balancing of prejudice versus probity."

The appellant argues that while the State maintained that Rule 404(b) evidence was admitted to prove motive, preparation, and/or plan for the shootings, the real purpose was to taint the jury's opinion of the appellant as a drug dealer. With regard to motive, the appellant states that any evidence relating to his drug dealing did not make it any more or less likely that the shootings were in retaliation for the burglary of his home by Ms. Coleman and Ms. Webb. With respect to planning and preparation, the appellant states that there was little or no evidence of planning or preparation by anyone. The appellant also maintains that the admission of such evidence was unfairly prejudicial [8] to

---

5. See W.Va.Code § 61-11-6 (1923), *infra*.

6. See footnote 1, *supra*.

7. See Syllabus Point 2, *McGinnis, infra*.

8. The appellant argues that although the State elicited testimony of the appellant's alleged drug

dealing as opposed to drug addiction, he still believes that the prejudicial effect was enhanced because selling drugs is generally viewed by society as more noxious than being addicted. He states that the evidence was not relevant and was more likely to be unreliable and in turn prejudicial.

him under Rule 403 of the West Virginia Rules of Evidence.[9]

Conversely, the State contends that presentation of the evidence of the appellant's drug activity in the context in which it was presented at trial was proper under the Rule 404(b) exceptions to the prohibition of introducing other crimes, wrongs, or acts. The State explains that the circuit court required it to file a detailed written notice of its intention to introduce Rule 404(b) evidence and the specific purposes for which such evidence would be introduced. The State filed that notice on May 18, 2009, and on July 6, 2009, the circuit court conducted a lengthy *McGinnis* hearing. Thereafter, on July 20, 2009, the circuit court reviewed each item of the proffered evidence, allowed the appellant's counsel to argue any potential objections to each, and then made specific findings on the record in compliance with this Court's directives in *McGinnis* and *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996). Moreover, the State notes that the circuit court gave a proper limiting instruction before the evidence was introduced and during the jury charge at the end of the trial.

Having reviewed the record below, this Court finds that the circuit court did not commit error in allowing the State to introduce the testimony concerning the appellant's sale of prescription medication as it related to the offenses for which he was convicted. In *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), this Court explained that,

> The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review de novo whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that

the "other acts" evidence is more probative than prejudicial under Rule 403.

196 W.Va. at 310–311, 470 S.E.2d at 629–630 (footnote omitted). Moreover, in Syllabus Point 2 of *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994), this Court outlined the procedure that trial courts must follow in determining whether to admit Rule 404(b) evidence:

> Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an in camera hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

Finally, in Syllabus Point 1 of *McGinnis*, this Court addressed the use of Rule 404(b) evidence as follows:

---

**9.** Rule 403 of the West Virginia Rules of Evidence provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

When offering evidence under Rule 404(b) of the West Virginia Rules of Evidence, the prosecution is required to identify the specific purpose for which the evidence is being offered and the jury must be instructed to limit its consideration of the evidence to only that purpose. It is not sufficient for the prosecution or the trial court merely to cite or mention the litany of possible uses listed in Rule 404(b). The specific and precise purpose for which the evidence is offered must clearly be shown from the record and that purpose alone must be told to the jury in the trial court's instruction.

193 W.Va. 147, 455 S.E.2d 516.

In this case, it was necessary for the State to present testimony regarding the appellant's drug activity to the extent that it was inextricably intertwined with the events that led to the murder of Ms. Webb, the malicious assault of Jeffrey Mullins, and the appellant's conspiracy to commit the underlying crimes. First, the State explained that part of its case relied on the proof of motive as discussed by the testimony of Mr. Mullins. To that end, the appellant's relationship with Mr. Mullins was directly linked to the drug activity. Mr. Mullins testified that he had sold drugs for the appellant over a period of years and that he became addicted to the drugs that were "fronted" to him by the appellant. Moreover, the contact that Mr. Mullins had with the appellant from the time the appellant's home was burglarized by Ms. Webb, to the time the appellant confronted Jeffrey Mullins at the S & M Market, until the time the appellant told him he was serious about having Ms. Webb and Jeffrey Mullins killed (and provided him with the murder weapon), all came about because Mr. Mullins was meeting with the appellant in order to obtain narcotic drugs to sell and to use. Furthermore, the evidence presented at trial showed that the debt of thousands of dollars that Mr. Mullins owed to the appellant was the sole reason he decided to take the pistol from the appellant and carry out the appellant's wishes to kill Ms. Webb and Jeffrey Mullins.

With regard to the testimony of Ms. Coleman, she testified that she had a relationship with the appellant that was based on her purchase of drugs from him. She explained that she and Ms. Webb went to the appellant's home to buy drugs, however, upon learning that he was not home, Ms. Webb committed the burglary in hopes of finding his "dope" and stealing it. This burglary was the exclusive reason given by Mr. Mullins that he was hired to kill Ms. Webb, Jeffrey Mullins, and to "get rid of the whole family." Finally, with regard to Freddie and Jessie Lynn Elswick, they testified about the appellant's drug activity and corroborated Mr. Mullins' testimony about the business arrangement between the appellant and those who sold drugs for him as well as the appellant's willingness to accept guns in exchange for drugs. This testimony corroborated Mr. Mullins' testimony that he had traded the 9mm pistol to the appellant on a prior occasion and that the gun was in the appellant's possession prior to his discussion with the appellant regarding killing Ms. Webb and Jeffrey Mullins in exchange for money. In consideration of all of the above, the evidence of the appellant's drug activity, in the context in which it was used during his trial, was extremely relevant and was at the very core of the motive for the shootings as well as the preparation and plan for the crimes.

In summary, during the July 6, 2009, suppression hearing, the State presented specific and detailed purposes establishing credible explanations and rationales for the admission of such evidence pursuant to the mandate of *McGinnis*. Moreover, as per the requirement set forth in *McGinnis* that a circuit judge must give a limiting instruction to the jury as to the purpose of the introduction of Rule 404(b) evidence, the circuit court gave such an instruction on several occasions. In fact, the circuit court gave the instruction both prior to the evidence being introduced, as well as during the charge to the jury at the conclusion of the trial. Under the standard of review established in *LaRock, supra,* as well as the procedures set forth in *McGinnis,* there was a clear factual basis for this evidence, it was established that it was given for a legitimate purpose, and there was no abuse of discretion with respect to its probative value outweighing any prejudice. Ac-

cordingly, this Court finds that the circuit court did not commit error by allowing the State to present the Rule 404(b) evidence to the jury.

### B. Sufficiency of the Evidence

■ Next, the appellant contends that the jury's verdict was contrary to law and that the evidence presented by the State was insufficient to sustain his convictions. Again, the appellant's argument concerns the testimony of Mr. Mullins. The appellant asserts that Mr. Mullins was untrustworthy and then cites to several statements made by Mr. Mullins which he contends were lies. He concludes that "it would be difficult to imagine a more unreliable and untrustworthy witness than [Mr.] Mullins."

Conversely, the State argues that the law provides that a jury's verdict should be respected and affirmed unless there is no evidence upon which verdicts of guilty beyond a reasonable doubt could be based. *See* Syllabus Point 2, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). Moreover, when a criminal defendant challenges the sufficiency of the evidence, all evidence must be viewed from the prosecutor's "coign of vantage." *See* Syllabus Point 2, *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996). As such, the State maintains that there was sufficient evidence to convict the appellant of the underlying crimes.

■ In Syllabus Point 1 of *Guthrie*, we set forth our standard of review for cases making a challenge to the sufficiency of the evidence. This standard is as follows:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Moreover, in Syllabus Point 3 of *Guthrie*, this Court held:

A criminal defendant challenging the sufficiency of the evidence to support a

conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

■ In this case, the appellant was an accessory before the fact to the underlying crimes. As such, "every accessory before the fact[ ] shall be punish[ed] as if he were the principal in the first degree[.]" W.Va. Code § 61–11–6 (1923), in part. Moreover, "[a]n accessory before the fact is a person who being absent at the time and place of the crime, procures, counsels, commands, incites, assists or abets another person to commit the crime, and absence at the time and place of the crime is an essential element of the status of an accessory before the fact." Syllabus Point 2, *State ex rel. Brown v. Thompson*, 149 W.Va. 649, 142 S.E.2d 711 (1965), overruled on other grounds by *State v. Petry*, 166 W.Va. 153, 273 S.E.2d 346 (1980). This Court has further held:

Where a defendant is convicted of a particular substantive offense, the test of the sufficiency of the evidence to support the conviction necessarily involves consideration of the traditional distinctions between parties to offenses. Thus, a person may be convicted of a crime so long as the evidence demonstrates that he acted as an accessory before the fact, as a principal in the second degree, or as a principal in the first degree in the commission of such offense.

Syllabus Point 8, *State v. Fortner*, 182 W.Va. 345, 387 S.E.2d 812 (1989).

Reviewing the record before this Court "in the light most favorable to the prosecution,"

it is abundantly clear that "any rational trier of fact could have found the essential elements of the crime[s] proved beyond a reasonable doubt." Syllabus Point 1, *Guthrie.* In that regard, the State presented evidence from which the jury could have concluded that Ms. Webb broke into the appellant's home. Then, based upon Ms. Coleman's testimony, jurors could have concluded that Ms. Webb came out of the appellant's home carrying the appellant's gold chains and guns. Jurors then heard Ms. Coleman and Mr. and Ms. Bolen testify that Ms. Coleman and Ms. Webb sold or pawned the stolen guns to Mr. Bolen. Next, based upon the testimony of Ms. Bolen, Ms. Coleman, and Mr. Mullins, it was revealed that the appellant had viciously whipped Ms. Coleman with a belt forcing her to tell him where his guns and other items were located. Soon thereafter, according to Ms. Bolen, the appellant came to her home and recovered the guns.

Additional evidence at trial establishing the appellant's anger regarding the burglary of his home included the testimony of Jeffrey Mullins and Lulabelle Webb, Ms. Webb's grandmother. They testified that a few weeks prior to the shootings, the appellant approached them at the S & M Market and assaulted Jeffrey Mullins, thereafter telling him "You're a dead motherfucker." Next, the appellant's daughter testified at trial that she was aware of the burglary of the appellant's home and that guns and jewelry had been stolen. She testified that her father and other family members believed that Ms. Webb, Jeffrey Mullins, and Ms. Coleman were the perpetrators of the crime.

Jurors also heard testimony from Mr. Mullins regarding the appellant's anger about the burglary of his home and his subsequent offer to pay him $20,000.00, $5,000.00 each, to kill Ms. Webb, Jeffrey Mullins, and to "get rid of the whole family." Mr. Mullins, who was thousands of dollars in debt to the appellant at that time, testified that the appellant

provided him with a Ruger 9mm semiautomatic pistol to carry out the plan. With regard to the 9mm pistol, evidence of a "bill of sale" was presented to show that the appellant was the owner of the gun and had purchased it in 1999.

The appellant's involvement in the murder, malicious assault, and conspiracy, was further established by testimony detailing the actions of Ms. Hicks, the appellant's sister-in-law, following Mr. Mullins' arrest. It was explained that she was instructed by the appellant to bring a bag of cash to Mr. Mullins' wife to hire a lawyer to represent Mr. Mullins. One of the attorneys hired by Ms. Mullins testified that he told Agent Aaron Yoh of the United States Bureau of Alcohol, Tobacco and Firearms that Ms. Mullins and another woman had brought $10,000.00 in cash to his office to retain him to represent Mr. Mullins.[10]

As this Court repeatedly has held, "a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Syllabus Point 3, in part, *Guthrie, supra.* In this case, it is undeniable that the jury was presented with sufficient evidence to support its finding that the appellant was guilty of the underlying crimes beyond a reasonable doubt. Therefore, this Court finds no error regarding this issue.

## IV.

## CONCLUSION

For the reasons stated above, we affirm the decision of the Circuit Court of McDowell County entered on October 7, 2009.

Affirmed.

---

**10.** The appellant devotes most of his brief to attacking the credibility of Mr. Mullins. The jurors, however, were properly instructed by the circuit court that they were the judges of the credibility of all of the witnesses and that they could disregard all or any part of any witness' testimony if they believed he or she had knowingly testified falsely about any material fact. Moreover, Mr. Mullins' testimony was corroborated

with the clear evidence of the burglary of the appellant's home and his resulting hostility toward the victims, the whipping of Ms. Coleman by the appellant before he recovered his stolen guns, the appellant having been in possession of the 9mm pistol that was used to commit the crimes, and the delivery of $10,000.00 in cash to retain an attorney for Mr. Mullins.